## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **David Perdue; and Perdue for Governor, Inc.,**<br><br>             **Plaintiffs,**<br><br>      **v.**<br><br>**Brian Kemp, in his personal capacity and in his official capacity as the Governor of Georgia; Christopher M. Carr, in his official capacity as the Attorney General of Georgia; James D. Kreyenbuhl, in his official capacity as Chairman of the Georgia Government Transparency and Campaign Finance Commission; Eric L. Barnum, in his official capacity as Vice Chair of the Georgia Government Transparency and Campaign Finance Commission; Robert A. Watts, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; Darryl Hicks, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; Rick Thompson, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; and Georgians First Leadership Committee, Inc.,**<br><br>             **Defendants.** | Case No. 1:22-cv-00053-MHC<br><br><br>**PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**<br><br>**DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

BACKGROUND ....................................................................................4

STANDARD OF REVIEW .....................................................................8

ARGUMENT ..........................................................................................9

    I.    Senator Perdue Will Succeed On The Merits. ....................................9

        A.    The Amendment Violates Senator Perdue's First Amendment Rights. ...................................................................9

            1.    The Amendment Severely Burdens Senator Perdue's First Amendment Rights..................................10

            2.    The Amendment Is Unsupported By A Compelling State Interest. ..............................................................14

            3.    The Amendment Is Not Narrowly Tailored. ..................17

        B.    The Amendment Violates Senator Perdue's Right To Equal Protection. .........................................................................18

    II.    Senator Perdue Is Suffering Immediate And Irreparable Harm..........20

    III.    The Balance Of Equities Favors Senator Perdue. ...............................22

    IV.    The Public Interest Favors Senator Perdue. .......................................23

CONCLUSION .....................................................................................25

## INTRODUCTION[1]

The Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other." *Davis v. FEC*, 554 U.S. 724, 738 (2008). Notwithstanding this clear mandate from the Supreme Court, in 2021, Georgia enacted a statute that is now doing precisely that in the ongoing Georgia gubernatorial election.

Georgia Senate Bill 221, which was signed by Governor Brian Kemp ("Governor Kemp") and is now codified at O.C.G.A. § 21-5-34.2 (the "Amendment"), effectively exempts Governor Kemp from Georgia's general campaign contribution limits. The Amendment allows Governor Kemp, as the incumbent, to establish a "leadership committee" that is eligible for unlimited campaign contributions which may be used to support his campaign. But the

---

[1] Plaintiffs have filed this Amended Motion for a Preliminary Injunction and Incorporated Memorandum of Law ("Amended Motion") upon verbal order of the Court made at the February 3, 2022 status conference on Defendant Georgians First Leadership Committee, Inc.'s Motion for Renewed Briefing and Hearing. This Amended Motion renews Plaintiffs' original Motion for a Preliminary Injunction filed on January 6, 2022 (ECF No. 2), with slight amendments only to reflect the filing of Plaintiffs' Amended Complaint on February 1, 2022 (ECF No. 47), including the addition of Georgians First Leadership Committee, Inc. and Governor Kemp in his individual capacity as defendants in this action. Plaintiffs respectfully dispute that any such amended filing is necessary. *See Vineyard Vines, LLC v. Outlet Tent Sales, LLC*, No. 3:19-CV-0036-TCB, 2019 WL 8277260, at *2 n.2 (N.D. Ga. Sept. 10, 2019); *see also Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966).

Amendment prohibits former United States Senator David Perdue ("Senator Perdue")—who is challenging Governor Kemp in the Republican gubernatorial primary election—from establishing such a leadership committee during the primary election. Georgia law prohibits Senator Perdue's campaign committee, Perdue for Governor, Inc., from raising and spending funds in the same manner as a leadership committee. As a result, Governor Kemp is able effectively to use two committees to support his campaign for Governor, one of which has no limits on contributions or expenditures. The law he signed ensures that, during the primary election, he is able to amass and spend a campaign war chest that Senator Perdue cannot possibly match.

For the reasons set out herein, the Amendment severely and unequally burdens the First Amendment rights of Senator Perdue in the gubernatorial primary race. The Amendment denies Senator Perdue the opportunity to raise and spend campaign funds to engage in campaign speech and promote his campaign message on equal footing with Governor Kemp.

As applied to the gubernatorial primary campaign, the principal effect of the Amendment is to protect the incumbent Governor. The Amendment places a challenger like Senator Perdue at a significant fundraising and campaign spending disadvantage in a competitive primary election. It also discriminates against Senator

Perdue—in favor of incumbent Governor Kemp—and denies him equal protection. The State's claimed interest in "transparency" does not at all support the burdens imposed by the Amendment, nor is the Amendment narrowly tailored to serve a compelling government interest.

Given the very short time frame until the primary election in May 2022, expedited action is necessary to remedy the continuing and ongoing harms caused by the Amendment. Governor Kemp established his leadership committee—Defendant Georgians First Leadership Committee, Inc. ("Georgians First")—months ago. As set out in the attached declaration, within hours of Senator Perdue announcing his candidacy for governor, Governor Kemp and Georgians First began using Georgians First funds to benefit his candidacy and campaign committee and to target Senator Perdue. In just the first month of Senator Perdue's campaign, Governor Kemp and Georgia First have already spent hundreds of thousands of dollars on ads targeting Senator Perdue, which are being used to mischaracterize Senator Perdue's years of distinguished public service in an attempt to frame the public perception of his candidacy early in the primary race. Governor Kemp and Georgians First has now spent at least $1 million more on similar ads.

In short, the Amendment allows and affords Governor Kemp two separate committees for his re-election campaign: a leadership committee that he chairs and

that has no contribution and spending limits, and a campaign committee that is subject to the usual contribution limits. Because of the Amendment, however, throughout the primary election Senator Perdue will only be permitted to operate the latter. The Amendment thus creates a structural campaign fundraising and spending imbalance between Governor Kemp and Senator Perdue—as well as any other gubernatorial challenger—that violates the United States Constitution and Supreme Court precedent. This imbalance cannot be remedied by anything less than immediate injunctive relief. The Court should remedy this constitutional violation by enjoining Governor Kemp and Georgians First from continuing to raise and spend unlimited funds through Georgians First. This remedy is necessary to stop the irreparable and ongoing harms to Senator Perdue's candidacy, as well as his constitutional right to engage in campaign speech.

## **BACKGROUND**

Prior to this year, the Georgia Government Transparency and Campaign Finance Act (the "Act"), O.C.G.A. §§ 21-5-1, *et seq.*, imposed campaign contribution limits equally on all gubernatorial candidates. Under this campaign finance regime, no candidate for governor may accept through his or her campaign committee, and no person may contribute, more than a specified amount "in the aggregate." *Id.* § 21-5-41(a). Specifically, gubernatorial candidates and their

campaign committees may accept in the aggregate up to $7,600 per person for the primary election and up to $4,500 per person for the primary runoff election.[2]  *Id.*

In 2021, the General Assembly passed, and Governor Kemp signed, the Amendment.  The Amendment allows Governor Kemp—but not Senator Perdue—to raise funds in unlimited amounts and make unlimited expenditures in the gubernatorial primary election, thus evading the stringent campaign committee contribution limits (and other restrictions) imposed by the Act.

Specifically, the Amendment authorizes "the Governor"[3] (but not Senator Perdue or other challengers prior to winning a political party's nomination in a primary election) to establish "[a] leadership committee [that] may accept contributions or make expenditures for the purpose of affecting the outcome of any election."  *Id.* § 21-5-34.2(d).  The Amendment provides that contributions to and

---

[2] As required by law, the contribution limits have been adjusted from time to time to account for inflation, so the dollar amounts written into the Act do not reflect the current limits.

[3] In addition to "the Governor," the Amendment authorizes leadership committees for the Lieutenant Governor, the nominee of a political party for Governor or Lieutenant Governor selected in a primary election, the majority and minority caucuses of the Georgia House of Representatives, and the majority and minority caucuses of the Georgia Senate.  O.C.G.A. § 21-5-34.2(a).  Because Senator Perdue is challenging Governor Kemp in the primary election, the Amendment does not permit Senator Perdue to establish a "leadership committee."  Senator Perdue is not challenging the Amendment with respect to leadership committees chaired by the majority and minority caucuses of the House of Representatives and Senate.

expenditures from a leadership committee may be used "for the election or defeat of any candidate," and to "defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office." *Id.* The Amendment thus makes plain that the funds raised for a leadership committee may be used for the same purpose as the funds raised by a candidate or a campaign committee.

In addition, the Amendment expressly provides that the Act's contribution limits applicable to candidates and campaign committees "shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate." *Id.* § 21-5-34.2(e). The Amendment thus authorizes Governor Kemp (but not Senator Perdue) to accept unlimited contributions to his "leadership committee" and to use those funds to further his campaign in the gubernatorial primary election.

This one-sided benefit advantages Governor Kemp and penalizes Senator Perdue. Most obviously, it permits Governor Kemp to raise unlimited campaign contributions from each of his supporters by asking them to direct their contributions to his uncapped "leadership committee," whereas Senator Perdue may only accept contributions from each of his supporters that are within the strict campaign committee contribution limits prescribed by the Act. The result is that to raise the same amount of funds as Governor Kemp, Senator Perdue must obtain contributions

in limited amounts from more of his supporters.  This requires Senator Perdue to expend more time and campaign resources than Governor Kemp in order to raise the same amount of funds, substantially burdening his First Amendment rights.

Governor Kemp is already exercising the unconstitutional benefit conferred on him by the Amendment.  On July 7, 2021, Governor Kemp established Georgians First.  Within hours of Senator Perdue announcing his primary challenge to Governor Kemp, Georgians First began using its unlimited funds to attack Senator Perdue and thereby benefit and support Governor Kemp's candidacy and campaign committee.

Between December 6, 2021, and December 21, 2021, Governor Kemp and Georgians First released at least eight separate digital advertisements attacking Senator Perdue.  *See* V. Compl., Ex. 1, Declaration of Taylor Brown ("Decl.") ¶¶ 21(a)–(l).  These and other advertisements state that they are "paid for by Georgians First Leadership Committee."  *See id.* ¶ 22.  In addition to the ads that are already running, Governor Kemp and Georgians First purchased broadcast and cable airtime for at least two separate television statewide-ad buys for the period December 14, 2021, through January 3, 2022, totaling $1 million.  *Id.* ¶ 21(i).

Governor Kemp and Georgians First have also launched a mail and internet campaign attacking Senator Perdue.  This campaign includes Facebook and Twitter

pages dedicated to attacking Senator Perdue, as well a webpage.  *See id.* ¶¶ 21(f), (j)–(l).  Like the television advertisement, the components of the internet campaign state that they are "paid for by Georgians First Leadership Committee." *See id.* ¶ 22.

In sum, Governor Kemp and Georgians First have already spent over $1 million dollars attacking Senator Perdue with negative advertisements using funds raised in unlimited amounts as permitted by the Amendment.  And they can be expected to continue spending hundreds of thousands—if not millions—of dollars doing so.  Meanwhile, the Act restrains Senator Perdue from fighting back on equal terms because contributions from his supporters remain subject to the strict statutory contribution limits that apply to campaign committees.

## STANDARD OF REVIEW

This Court may grant preliminary relief when a party establishes: (1) "it has a substantial likelihood of success on the merits"; (2) "irreparable injury will be suffered unless the injunction issues"; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) "if issued, the injunction would not be adverse to the public interest." *Jones v. Gov. of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Because all four factors favor Senator Perdue and Perdue for Governor, Inc. (together "Senator Perdue"), they are

entitled to preliminary relief.

## **ARGUMENT**

**I.    SENATOR PERDUE WILL SUCCEED ON THE MERITS.**

### A.    The Amendment Violates Senator Perdue's First Amendment Rights.

The First Amendment, incorporated through the Fourteenth Amendment, prohibits Georgia from "abridging the freedom of speech."  U.S. Const. amend. I.  "Above 'all else, the First Amendment means that government' generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Barr v. Am. Assn. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

In "election related settings," the Supreme Court often applies "exacting scrutiny."  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  *But see McConnell v. FEC*, 540 U.S. 93, 266 (2003) (Thomas, J., concurring) ("[C]ampaign finance laws are subject to strict scrutiny." (citation omitted)).  Under that standard, a burden on a candidate's speech "cannot stand unless it is 'justified by a compelling state interest.'"  *Davis*, 554 U.S. at 740; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736–40 (2011).  Furthermore, the restriction must "be narrowly tailored to the interest it promotes."  *Ams. for Prosperity Found.*, 141 S. Ct. at 2385; *see, e.g., Randall v. Sorrell*, 548 U.S. 230,

261 (2006) (plurality) (holding contribution limits "not narrowly tailored"); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 261 (1986) (similar).

The Amendment fails exacting scrutiny because it severely burdens Senator Perdue's First Amendment rights and is not narrowly drawn to advance a compelling state interest. For the same reasons, the Amendment would fail any other potentially applicable tier of scrutiny.

### 1. The Amendment Severely Burdens Senator Perdue's First Amendment Rights.

The Amendment severely burdens Senator Perdue's First Amendment rights by permitting Governor Kemp to establish "[a] leadership committee [that] may accept contributions or make expenditures for the purpose of affecting the outcome of [the] election" and "defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office." O.C.G.A. § 21-5-34.2(d). Under the Amendment, "the contribution limits" that apply to Senator Perdue pursuant to the Act "shall not apply" to Governor Kemp's "leadership committee." *Id.* § 21-5-34.2(e).

There can be no serious dispute that these "asymmetrical limits" severely burden Senator Perdue's freedom of speech and association. *Davis*, 554 U.S. at 741. Money is the lifeblood of modern political campaigns because "virtually every means of communicating ideas in today's mass society requires the expenditure of

money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976); *accord Citizens United v. FEC*, 558 U.S. 310, 351 (2010) ("All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech . . . ."). "[T]elevision, radio, and other mass media" are "expensive," *Buckley*, 424 U.S. at 19, and candidates must often hold large-scale "[s]peeches and rallies" to connect with voters, events which "generally necessitate hiring a hall and publicizing the event," *id.* Even the "distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs." *Id.*

To defray these campaign expenses, candidates must engage in fundraising. The Supreme Court has recognized that "[l]imits on contributions necessarily increase the burden of fundraising." *Randall*, 548 U.S. at 245 (quoting *Buckley*, 424 U.S. at 96). That is because "contribution ceilings . . . require candidates and political committees to raise funds from a greater number of persons" than they otherwise would to "amass[ ] the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21–22; *see also Davis*, 554 U.S. at 751 ("[C]andidates and their staffs [bear] the interminable burden of fundraising . . . ."). Because "[f]undraising consumes candidate time that otherwise would be devoted to campaigning," *Randall*, 548 U.S. at 246 (citation omitted), a law that produces "fundraising advantages" for the candidate's opponent is undeniably a "drag on First Amendment

rights," *Davis*, 554 U.S. at 739.

The Amendment places Senator Perdue at precisely this type of electoral disadvantage.  Under the Act, Senator Perdue may accept no more than $7,600 for the primary and $4,500 for a potential primary runoff from each contributor. O.C.G.A. § 21-5-41(a).  Indeed, under the Amendment, that limitation applies to every other candidate for governor **unless and until** they win a political party's nomination in a primary election.  *Id.* § 21-5-34.2(a).  Meanwhile, Governor Kemp's leadership committee can already raise and spend unlimited funds from each contributor.  *Id.* § 21-5-34.2(e).  Thus, during the primary election, to compete dollar-for-dollar with Governor Kemp, Senator Perdue must raise contributions from vastly more contributors.  This requires Senator Perdue to expend more candidate time and more campaign resources on fundraising than Governor Kemp.

As detailed above, Governor Kemp is already pressing his unconstitutional structural advantage.  He has already begun to use contributions raised under the Amendment to fund attack ads through Georgians First against Senator Perdue, which are being disseminated daily and will continue to be disseminated throughout the primary.  There is no question that Governor Kemp and Georgians First will continue to use Georgians First funds to flood the competitive political market with advertisements attacking Senator Perdue and impugning his reputation with Georgia

voters during the primary campaign; in this way, Georgians First will continue functioning essentially as a component of Governor Kemp's campaign committee.

The asymmetry created by the Amendment is similar to that which the Supreme Court found unconstitutional in *Davis*.  There, the challenged statute raised contribution limits for only one candidate in a single race.  The other candidate in the race, therefore, faced the possibility that his opponent would be able to raise additional funds above and beyond the otherwise applicable contribution limits.  The Supreme Court held that this was an "unprecedented penalty," a "special and potentially significant burden" that was not justified by a compelling state interest. *Davis*, 554 U.S. at 739–40; *see also Ariz. Free Enter.*, 564 U.S. at 736–40 (enjoining statute that penalized speech by providing extra public financing to candidate's opponent).

Indeed, the First Amendment burden is particularly acute in this case because the Amendment is designed to put only "challengers to a significant disadvantage." *Randall*, 548 U.S. at 248.  Under the Amendment, the incumbent "Governor" may establish a leadership committee at any time.  O.C.G.A. § 21-5-34.2(a).  Meanwhile, a challenger for the same office may not establish a leadership committee unless he or she becomes "the nominee of a political party." *Id.*  This means that a primary challenger such as Senator Perdue to an incumbent candidate such as Governor

Kemp will be at a significant electoral disadvantage.  By thus "preventing challengers from mounting effective campaigns against incumbent officeholders," the Amendment "reduc[es] democratic accountability."  *Randall*, 548 U.S. at 248.

The severity of the First Amendment burden is also underscored in this case because "the legislature's speaker preference reflects a content preference." *Political Consultants*, 140 S. Ct. at 2347 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015)).  Here, the Amendment clearly favors a particular viewpoint: that of the incumbent Governor and speech in support of the incumbent Governor.  The Amendment does so by making it easier for Governor Kemp to engage in political speech using his leadership committee.  Senator Perdue, as the primary competitor to Governor Kemp in the gubernatorial primary, by contrast, is subject to strict limitations on his political speech in the form of campaign contribution limits.

### 2.    The Amendment Is Unsupported By A Compelling State Interest.

Because the Amendment substantially burdens Senator Perdue's First Amendment rights, the Amendment "cannot stand unless it is 'justified by a compelling state interest.'"  *Davis*, 554 U.S. at 740 (quoting *Mass. Citizens for Life*, 479 U.S. at 256).  "[T]he only legitimate and compelling government interests thus far identified [by the Supreme Court] for restricting campaign finances" are "[p]reventing corruption or the appearance of corruption."  *Id.* at 741 (quoting *FEC*

*v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496–97 (1985)).

The Amendment has nothing to do with either.  In this context, "corruption" means "quid pro quo corruption," that is, "a direct exchange of an official act for money."  *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (plurality); *see also Citizens United*, 558 U.S. at 359 ("[C]orruption is the financial *quid pro quo*: dollars for political favors . . . .").  But to the extent that interest "is served by contribution limitations," *Ariz. Free Enter.*, 564 U.S. at 751, the Amendment undermines rather than advances that interest by retaining contribution limits for Senator Perdue and eliminating them only for Governor Kemp.  Unlike Governor Kemp, Senator Perdue does not currently hold elected office.  It is inconceivable that an Amendment designed to advance an anticorruption interest would remove contribution limits only for incumbent officeholders while maintaining them for challengers.

Indeed, there is nothing in the legislative record of the Amendment to suggest that the General Assembly sought to address quid pro quo corruption or its appearance.  This stands in marked contrast to *Buckley*, where a congressional select committee determined that the problem of quid pro quo corruption was "not an illusory one."  424 U.S. at 27 & n.28; *see Buckley v. Valeo*, 519 F.2d 821, 839 n.35 (D.C. Cir. 1975), *aff'd in part, rev'd in part,* 424 U.S. 1 (1976).  It is also unlike *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), where Congress banned

contributions and expenditures by foreign nationals only after "an extensive investigation by the Senate Committee on Governmental Affairs" concluded that foreign governments had attempted "to 'influence U.S. policies and elections through, among other means, financing election campaigns.'" *Id.* at 283 (quoting S. Rep. No. 105-67, at 47 (1998)); *see also McConnell v. FEC*, 251 F. Supp. 2d 176, 209 (D.D.C.) (examining "evidentiary submissions" comprising "over 100,000 pages of materials"), *judgment entered*, 251 F. Supp. 2d 948 (D.D.C. 2003), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003).  There is no such legislative record here.

To be sure, some of the Amendment's supporters in the Legislature claimed it would promote "transparency."  *See* Georgia State Senate, *Legislative Day 24 (2/26/21)*, YouTube (Feb. 26, 2021), https://youtu.be/LhjTLrabGE8 (floor statement by bill sponsor Sen. Jeff Mullis, at 3:41:10 to 3:48:23) (emphasizing that the Amendment would promote "transparency" to stop the influx of "dark money" in Georgia politics); *see also* James Salzer, *Georgia Senate GOP passes bill to get more money from big political donors*, The Atlanta J.-Const. (Feb. 26, 2021), https://bit.ly/3qJgTBw.  But that purported rationale is inapposite because the Amendment merely incorporates by reference the same disclosure requirements that are already applicable under the Act.  *See* O.C.G.A. § 21-5-34.2(e).  In any event, transparency does nothing to address the Amendment's "asymmetrical limits."

*Davis*, 554 U.S. at 741.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."  *Id.* at 741–42 (quoting *Buckley*, 424 U.S. at 48–49).

In reality, the only interest the Amendment serves is incumbent protection for the sitting Governor.  *See* § I.A., *supra*.  But that interest has "ominous implications," as it would allow the government "to arrogate the voters' authority to evaluate the strengths of candidates competing for office."  *Davis*, 554 U.S. at 742.  By enacting a campaign finance law to protect the incumbent Governor, Georgia makes a judgment as to who is worthy of election.  "The Constitution, however, confers upon voters" the power to choose their representatives, not the state, and "it is a dangerous business" for Georgia "to use the election laws to influence the voters' choices."  *Id.*

### 3.    The Amendment Is Not Narrowly Tailored.

Even if there were some compelling interest in play, the Amendment "is poorly tailored."  *McCutcheon*, 572 U.S. at 218; *see Ams. for Prosperity Found.*, 141 S. Ct. at 2383 ("While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest.").

To begin with, the Amendment is underinclusive with respect to any

conceivable anticorruption interest.  As detailed above, the Amendment leaves in place the Act's contribution limits for challengers but removes them for incumbents. That makes no sense for an anticorruption statute, however, because actual or apparent corruption relating to campaign contributions is inherently tied to the potential for misuse of public office.  *See Buckley*, 424 U.S. at 30; *cf. Ted Cruz for Senate v. FEC*, 2021 WL 2269415, at *11 (D.D.C. June 3, 2021) ("[T]he risk of *quid pro quo* is virtually non-existent where the contribution is made to a losing candidate . . . ." (quoting *Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004))). Thus, whatever anticorruption interest Georgia may have in restricting contributions to **candidates**, that interest is even stronger with respect to **incumbents**.  That the Amendment lifts contribution limits only for incumbents shows that it does not advance any anticorruption interest.

Nor is the Amendment tailored to an interest in "transparency."  As explained above, the Amendment's disclosure provision merely incorporates by reference the disclosure requirement already contained in the Act and applies it to contributions that are newly authorized by the Amendment.  *See* O.C.G.A. § 21-5-34.

**B.**   **The Amendment Violates Senator Perdue's Right To Equal Protection.**

Senator Perdue will also succeed on the merits because the Amendment deprives him of equal protection of the law.  The Fourteenth Amendment prohibits

Georgia from denying "any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Where, as here, the challenged classification is not itself "suspect" but does infringe upon a fundamental right, "greater scrutiny" is required.  *Riddle v. Hickenlooper*, 742 F.3d 922, 927 (10th Cir. 2014); *accord Buckley*, 424 U.S. at 30–35.

There can be no dispute that the Amendment discriminates against gubernatorial challengers like Senator Perdue in favor of the incumbent candidate. Indeed, this disparity is particularly acute in the primary.  Again, the Amendment allows Governor Kemp to chair—and raise and spend unlimited contributions collected by—a leadership committee during the primary election.  A gubernatorial primary challenger like Senator Perdue cannot.  Moreover, if the Amendment stands, then in future Georgia elections whichever party holds the Governorship will have an inherent advantage in the general election, because the incumbent Governor of that party will have had the opportunity to raise unlimited funds throughout the primary and general elections, whereas any challenger from the other party will only have that right after the primary election, when that person becomes the nominee.

The stark disparities created by the Amendment are already manifest here. Governor Kemp has begun to use his leadership committee funds to disseminate ads targeting Senator Perdue, and he will continue to do so in the weeks and months

ahead. *See supra* at 6–7.  Senator Perdue, meanwhile, cannot respond to these attack ads or otherwise promote his message equally because he cannot raise campaign funds with equal efficiency.  And as explained above, Georgia cannot show that these burdens are narrowly tailored to advance any legitimate governmental interest, let alone a compelling one.

A similar unbalanced and discriminatory campaign finance regime was declared unconstitutional in *Riddle*.  There, the Tenth Circuit struck down a campaign finance regulation that imposed unequal contribution limits for a write-in candidate and party nominees, finding that the "discriminatory limits are not closely drawn to the State's interest in battling corruption or the appearance of corruption." *Riddle*, 742 F.3d at 929.  This same "basic favoritism between candidates vying for the same office" is inherent in—and indeed, is the entire purpose of—the Amendment.  *Id.*  The Amendment thus violates the Equal Protection Clause of the Fourteenth Amendment as well as the First Amendment.

## II.   SENATOR PERDUE IS SUFFERING IMMEDIATE AND IRREPARABLE HARM.

Expedited injunctive relief is necessary here because the unconstitutional Amendment has been causing and will continue to cause irreparable harm to Senator Perdue.  Most fundamentally, Governor Kemp is using funds unconstitutionally raised by his leadership committee to target Senator Perdue and his candidacy on a

daily basis.  Indeed, within hours of Senator Perdue entering the gubernatorial race, Governor Kemp's attacks, financed by Georgians First, began and they have been relentless ever since.  *See supra* at 6–7.

The reputational harm to Senator Perdue caused by these ads funded by unconstitutional contributions is plainly irreparable.  *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) ("[I]t is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm.").  And that harm is particularly acute given the electoral context.  An election is finite in length, and election results are final.  "[O]nce the election occurs, there can be no do-over and no redress."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d, 224, 247 (4th Cir. 2014).  A negative election result "cannot be remedied by an award of monetary damages."  *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005).

Here, failing to respond to early negative advertisements can be particularly damaging for candidates, like Senator Perdue, whose prior experience and government service is mischaracterized.  Misleading advertisements disseminated early in a campaign can subvert public opinion.  *See* Decl. ¶ 24.  They also force the subject of the advertisements to determine whether to expend his or her limited early campaign resources on long-term campaign investments or to fight back

immediately against the negative advertisements.  *See id.* ¶ 25.

There also can be no dispute that an "ongoing violation of the First Amendment constitutes an irreparable injury."  *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1286 (11th Cir. 2021) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).  First Amendment violations, "because of [their] intangible nature, could not be compensated for by monetary damages."  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).  A preliminary injunction that ceases these substantial and ongoing harms is ultimately necessary for a constitutional—and fair—gubernatorial election.

## III.   THE BALANCE OF EQUITIES FAVORS SENATOR PERDUE.

The balance of equities also weighs heavily in favor of Senator Perdue.  Absent an injunction, Senator Perdue will continue to have his constitutional rights violated.  As discussed above, the different contribution limits that the Amendment imposes on Senator Perdue while he runs for the same office as Governor Kemp are "antithetical to the First Amendment."  *Davis*, 554 U.S. at 743–44.  The Amendment's removal of contribution limits for Governor Kemp's leadership committee places Senator Perdue at a severe electoral disadvantage and severely

burdens his candidacy for governor.  The Amendment also discriminates against Senator Perdue in favor of Governor Kemp.

By contrast, the hardship on Defendants is minimal.  The only hardships that Georgia, Governor Kemp, and Georgians First will experience if the Amendment is enjoined are that the State will no longer be permitted to enforce its unconstitutional law, and Governor Kemp and Georgians First will be required to comply with the same contribution limits to which his challenger is subjected, which are the same rules under which Governor Kemp previously has sought election.  Governor Kemp already has an alternative means to obtain campaign contributions and further his re-election campaign: the campaign committee he previously established pursuant to the pre-existing Georgia campaign finance regime.  Thus, Governor Kemp will be in the same position he would have been without the Amendment's incumbent-favoring provisions.  The balance of hardships favors Senator Perdue.  *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[First Amendment injury] clearly outweighs whatever damage the injunction may cause the city.").

## IV.   THE PUBLIC INTEREST FAVORS SENATOR PERDUE.

Finally, granting a preliminary injunction will benefit the public interest.  "[T]he public interest is always served in promoting First Amendment

values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001).  By contrast, the public "has no interest in enforcing an unconstitutional law." *Scott*, 612 F.3d at 1297; *KH Outdoor*, 458 F.3d at 1272 ("[T]he city has no legitimate interest in enforcing an unconstitutional ordinance.").  Indeed, "should the statute be unconstitutional, the public interest would be adversely affected by denial of such an injunction." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988); *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) ("[I]t is always in the public interest to prevent violation of a party's constitutional rights.").  Here, an injunction enforcing the constitutional requirement that all candidates for the same public office be subject to the same contribution limits would plainly serve these interests.

The injunctive relief requested would also serve the public interest by restoring the even-handed contribution limits established by the Act.  The Amendment's leadership committees are an "exception" to the otherwise applicable campaign contribution limits that apply to gubernatorial candidates.  *See Political Consultants*, 140 S. Ct. at 2355.  And severing the Amendment from the Act does not raise any other constitutional problems.  Indeed, Georgia's campaign committee contribution limits have not been challenged as, let alone declared, unconstitutional.  *Cf. Ga. State Conf. of NAACP Branches v. Cox*, 183 F.3d 1259 (11th Cir. 1999)

(dismissing challenge regarding contribution exemptions for lack of standing). Thus, the result that best serves the public interest in this case is to enjoin enforcement of the Amendment and to leave in place Georgia's longstanding campaign-finance restrictions. *See Political Consultants*, 140 S. Ct. at 2355.

## **CONCLUSION**

For all the foregoing reasons, the Court should grant the Motion and grant the relief requested in the Complaint.[4]

Respectfully submitted,

February 4, 2022

WILEY REIN LLP
Michael Toner
(admitted *pro hac vice*)
Brandis L. Zehr
(admitted *pro hac vice*)
Stephen J. Obermeier
(admitted *pro hac vice*)
Jeremy J. Broggi
(admitted *pro hac vice*)

By:   /s/ Douglas Chalmers, Jr.

CHALMERS & ADAMS LLC
Douglas Chalmers, Jr. (GA Bar #118742)
Heather Wagner (GA Bar # 962353)
5805 State Bridge Road #G77
Johns Creek, GA 30097
Phone: (770) 630-5927
Fax: (866) 716-6089

*Counsel for Plaintiffs*

---

[4] As Plaintiffs argued, this Court has authority to issue a preliminary injunction against Georgians First through Governor Kemp under binding Eleventh Circuit precedent. *See* ECF No. 39. At the January 31 Hearing, the Court questioned the application of that precedent because Plaintiffs had not sued Governor Kemp in his personal capacity. Plaintiffs have now done so, eliminating any doubt regarding the Court's authority to enjoin Georgians First through the Governor.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs' Motion for a Preliminary Injunction and Incorporated Memorandum of Law has been prepared in accordance with the font type and margin requirements of N.D. Ga. L.R. 5.1, using font type of Times New Roman and a point size of 14.

February 4, 2022

By:   /s/ Douglas Chalmers, Jr.
CHALMERS & ADAMS LLC
Douglas Chalmers, Jr. (GA Bar #118742)
Heather Wagner (GA Bar # 962353)
5805 State Bridge Road #G77
Johns Creek, GA 30097
Phone: (770) 630-5927
Fax: (866) 716-6089

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2022, I electronically filed the forgoing Plaintiffs' Reply in Support of Their Motion for a Preliminary Injunction with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

H. Christopher Bartolomucci,
Annika M. Boone,
Brian Field,
Erik Scott Jaffe,
Loree Anne Paradise,
Gene C. Schaerr,
Edward Bedard,
Vincent Robert Russo, Jr.,
Jason Brett Torchinsky, and
Elizabeth Marie Wilson Vaughan

/s/ Douglas Chalmers, Jr.
Douglas Chalmers, Jr.
Georgia Bar No. 18742
Heather Wagner
Georgia Bar No. 96235
Attorneys for David Perdue and Perdue for
Governor, Inc.

CHALMERS & ADAMS LLC
5805 State Bridge Road #G77
Johns Creek, GA 30097
Phone: (770) 630-5927
Fax: (866) 716-6089
Email: dchalmers@chalmersadams.com

# <u>EXHIBIT 1</u>

## DECLARATION OF TAYLOR BROWN
## IN SUPPORT OF VERIFIED COMPLAINT

I, Taylor Brown, hereby declare as follows under the penalty of perjury.

1.      The following statements are based on my personal knowledge, and if called to testify I could swear competently thereto.

2.      I am 32 years old and of sound mind.

3.      I am a citizen of the United States and of the State of Georgia.

4.      I reside in Chamblee, Georgia, in Dekalb County.

5.      I am currently serving as the campaign manager of Perdue for Governor, Inc. (the "Perdue Campaign").

6.      I received an undergraduate degree from University of Georgia in 2010. I received a Juris Doctor degree from Mercer University – Walter F. George School of Law in 2013.  I have been a member of the State Bar of Georgia since 2014.

7.      I have extensive campaign experience, including serving as Campaign Manager for Kelly Loeffler's 2020 campaign for U.S. Senate, serving as Campaign Manager to Republican candidate for Governor Clay Tippins in the 2018 election cycle, and serving as a general consultant for several successful political campaigns in the 2016 election cycle.

8.      Former United States Senator David Perdue ("Senator Perdue") is a candidate seeking the Republican nomination for Governor of Georgia in 2022.  The

Perdue Campaign is Senator Perdue's campaign committee in his campaign for Governor, and it is registered as such with the Georgia Government Transparency and Campaign Finance Commission (the "Commission").

9.    Georgia's primary election is scheduled to take place on May 24, 2022; a primary runoff is scheduled to be held on June 21, 2022, if necessary.

10.    As campaign manager, I am responsible for the day-to-day management and oversight of the Perdue Campaign's activities.

11.    My duties include management and oversight of all activities undertaken by the Perdue Campaign, including fundraising and voter persuasion efforts.  As part of those duties, I am required to maintain accurate and up-to-date knowledge of the limits on fundraising and other campaign activities imposed by relevant state campaign finance laws.  I am further required to remain informed regarding the fundraising and voter persuasion efforts of other potential and declared candidates for Governor of Georgia.

12.    Currently, the Georgia Government Transparency and Campaign Finance Act (the "Act") limits the amount of contributions that candidate campaign committees, such as the Perdue Campaign, may accept.  Specifically, the Perdue Campaign is prohibited from receiving contributions from any person that aggregate

in excess of $7,600 for the primary election, $4,500 for the primary runoff election, $7,600 for the general election, and $4,500 for the general runoff election.

13.     The Perdue Campaign is allowed to use campaign contributions "only to defray ordinary and necessary expenses" of the campaign.

14.     Senator Perdue's most significant competitor for the Republican nomination for Governor of Georgia is incumbent Governor Brian Kemp.  Governor Kemp is likely to remain the Perdue Campaign and Senator Perdue's most significant competitor throughout the primary campaign.

15.     Governor Kemp currently chairs Georgians First Leadership Committee ("Georgians First"), a leadership committee (as defined by Georgia Code § 21-5-34.2) registered with the Commission.

16.     It is my understanding that Governor Kemp registered Georgians First with the Commission on July 7, 2021, only a week after the Act creating leadership committees became effective on July 1, 2021.

17.     It is my understanding that, as a leadership committee, Georgians First is exempt from the Act's limits on contribution amounts that apply to campaign committees, including those applicable to the Perdue Campaign.  That is, Georgians First may accept unlimited contributions, and contributions to Georgians First do not count against the contribution limits for Governor Kemp's campaign committee.

18.     Georgians First is also permitted to "make expenditures for the purpose of affecting the outcome of any election or defeat of any candidate," and to "defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office," without having to report the expenditures as in-kind contributions to the candidate benefitting from the expenditure.

19.     Georgians First, therefore, may operate as a de facto second campaign committee for incumbent Governor Kemp in the Georgia gubernatorial race—which is allowed to accept unlimited campaign contributions and make unlimited expenditures for the purpose of advancing Governor Kemp's re-election campaign—while Senator Perdue is limited to a single campaign committee which is subject to the contribution limits that are otherwise imposed on candidates for elected office in Georgia.

20.     Georgians First has already begun raising funds and making expenditures on advertisements targeting Senator Perdue.  Within only hours of Senator Perdue's announcement of his candidacy for Governor, on December 6, 2021, Governor Kemp and Georgians First began disseminating negative campaign ads targeting Senator Perdue.

21.     As of the date of this declaration, Governor Kemp and Georgians First have spent more than a million dollars specifically attacking Senator Perdue and his

4

candidacy for the Republican nomination for Governor of Georgia with negative advertisements on television, email, Google, and Facebook:

a.  On or around December 6, 2021, Governor Kemp and Georgians First launched a fifteen-second ad targeting Senator Perdue, entitled "Headlines."  *See* Georgians First Leadership Comm., *Headlines*, YouTube (Dec. 6, 2021), https://youtu.be/mrQkXV1dK1c.

b.  On or around December 7, 2021, Governor Kemp and Georgians First launched a thirty-five second ad targeting Senator Perdue, entitled "Perdue Lost."  *See* Georgians First Leadership Comm., *Perdue Lost*, YouTube (Dec. 7, 2021), https://youtu.be/NZBA80_ipWk.

c.  On or around December 8, 2021, Governor Kemp and Georgians First launched a sixteen-second ad targeting Senator Perdue, entitled "Outsourcing."  *See* Georgians First Leadership Comm., *Outsourcing*, YouTube (Dec. 8, 2021), https://youtu.be/gkQaFPG948Q.

d.  On or around December 9, 2021, Governor Kemp and Georgians First launched a twelve-second ad targeting Senator Perdue, entitled "Run Another Campaign."  *See* Georgians First Leadership Comm., *Run Another Campaign*, YouTube (Dec. 9, 2021), https://youtu.be/EXdFDxqGWUk.

e.  On or around December 10, 2021, Governor Kemp and Georgians First launched a fifteen-second ad targeting Senator Perdue, entitled "Perdue Losing."   *See* Georgians First Leadership Comm., *Perdue Losing*, YouTube (Dec. 10, 2021), https://youtu.be/bUEqFnUnpKs.

f.  On or around December 13, 2021, Governor Kemp and Georgians First paid for an email advocating against the nomination of Senator Perdue (*see* Email Update, Georgians First Leadership Comm., https://bit.ly/34cjiNj (last visited Jan. 3, 2022)) stating, in relevant part, that "David Perdue would lose big to Stacey Abrams," and "will COST GEORGIANS EVERYTHING" if nominated.   The email includes a link to a video hosted on Georgians First's Facebook page targeting Senator Perdue.  *See* Georgians First Leadership Comm., *Hardworking Georgians cannot risk it all on former Senator Perdue to deliver a win over Stacey Abrams*, Facebook (Dec. 13, 2021), https://www.facebook.com/watch/?v=608365030378101.

g.  On or around December 14, 2021, Governor Kemp and Georgians First launched a thirty-one-second ad targeting Senator Perdue, entitled "America First."   *See* Georgians First Leadership Comm. *America First*, YouTube (Dec. 14, 2021), https://youtu.be/BV592xYTBkE.

h.  Governor Kemp and Georgians First have purchased broadcast and cable air time for at least two separate television ads across the state totaling $1 million for December 14, 2021, through January 3, 2022. *See* Greg Bluestein, *Kemp's first anti-Perdue ad leverages a key campaign finance edge*, The Atlanta J.-Const. (Dec. 14, 2021), https://bit.ly/3FSUY18.

i.  Governor Kemp and Georgians First have launched a webpage targeting Senator Perdue, "formersenatordavidperdue.com."

j.  Governor Kemp and Georgians First have also launched a Twitter account that appears to be dedicated to promoting the candidacy of Governor Kemp and attacking the candidacy of Senator Perdue. *See* @Georgians_First, Twitter, https://twitter.com/georgians_first (last visited Jan. 3, 2022).

k.  On or around December 21, 2021, Governor Kemp and Georgians First released a twenty-one-second ad on the Georgians First twitter account targeting Senator Perdue for "flip flopping." *See* Status, @Georgians_First, Twitter, https://bit.ly/3JCA1cS (Dec. 21, 2021).

l.  On or around January 4, 2022, Governor Kemp and Georgians First paid for a direct mail advertisement stating "Millionaire David Perdue

Got Rich Putting Himself First & Sending American Jobs to China"
and caused that mail advertisement to be mailed to an unknown number
of Georgia residents.

22.    These and other advertisements state that they are "paid for by
Georgians First Leadership Committee."

23.    These videos, emails, and websites are part of a coordinated campaign
by Governor Kemp and Georgians First to smear Senator Perdue's reputation, frame
voters' perceptions of Senator Perdue, and urge voters not to vote for Senator Perdue
in the 2022 Republican gubernatorial primary election.

24.    Based on my experience and knowledge working in electoral politics,
framing the debate and defining both yourself and your opponent are incredibly
important aspects of the early stages of a political campaign.  Mischaracterization
efforts to define candidates and frame debates are often particularly impactful early
in a campaign, subverting public opinion before voters have had the opportunity to
develop fully formed opinions of the candidates.

25.    It is critical that candidates and campaigns push back against early
misleading attempts to define them in a negative light or mischaracterize the
narrative of the election in a way that is unfavorable to the candidate.  Efforts to
counter early misleading advertisements require a large amount of funds, and

because the Perdue Campaign is subjected to different contribution limits and rules than those applicable to Governor Kemp and Georgians First, the Perdue Campaign presently lacks the resources to effectively respond to this barrage of early negative advertisements.   The Perdue Campaign has suffered and will continue to suffer irreparable harm as a result of these advertisements by Georgians First—which is chaired by Governor Kemp and is essentially functioning as a de facto second campaign committee for Governor Kemp—because the Perdue Campaign must determine whether to expend its limited early campaign resources on long-term investments designed to build a consistent donor base and campaign operation or fight back against the negative narrative and image created by the attack advertisements.

26.    The ability to use a leadership committee funded by unlimited contributions to finance and conduct an early advertising campaign to negatively define his opponents and frame debates grants Governor Kemp a major advantage in the Republican gubernatorial primary election.

27.    The advantage afforded Governor Kemp by his leadership committee grows with every day that a video or website posted by Georgians First remains up. The advantage afforded Governor Kemp also increases with each new video, email, website, or advertisement targeting Senator Perdue and paid for by Georgians First.

9

28.     The ability of Georgians First to use the unlimited funds it raises to "defray ordinary and necessary expenses incurred in connection with" Governor Kemp's campaign for the Republican nomination compounds his structural advantage.  Because Georgians First may use its funds to cover all of Governor Kemp's campaign's expenses, Georgians First essentially circumvents all campaign contribution limits otherwise imposed on Governor Kemp by the Act.

29.     Because of the Act creating leadership committees, at no point during the primary campaign will Senator Perdue be permitted to chair a leadership committee.

30.     The ability to effectively circumvent the contribution limits imposed by the Act grants Governor Kemp and his campaign a massive structural advantage over Senator Perdue.

31.     Because Senator Perdue will not have access to a leadership committee during the primary election, the Perdue Campaign will be forced to pursue and obtain an untold number of unique, unaggregated campaign contributions in order to have any chance of approaching financial parity with the funds Governor Kemp will be able to raise by using his leadership committee to circumvent Georgia's campaign contribution limits on campaign committees.

32.     As described above, the structural advantages provided by Georgians First and the availability of a leadership committee to Governor Kemp pursuant to Georgia Code § 21-5-34.2 are already inflicting irreversible harm on the Perdue Campaign and the candidacy of Senator Perdue.

33.     I declare under penalty of perjury that the foregoing is true and correct.


Taylor Brown


Date

11