IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID PERDUE, and
PERDUE FOR GOVERNOR, INC.,

*Plaintiffs*,

v.

BRIAN KEMP, in his official capacity as
Governor of Georgia, *et al.*,

*Defendants*.

CIVIL ACTION NO.

1:22-CV-53-MHC

BRIEF OF DEFENDANT GEORGIANS FIRST LEADERSHIP
COMMITTEE IN OPPOSITION TO PLAINTIFFS'
AMENDED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

BACKGROUND ...............................................................................................2

I.   The Statutory Background...........................................................................2

II.  Georgians First and Kemp for Governor, Inc. Have Relied on the
     Leadership Committee Statute ...................................................................3

III. Recent Advertisements................................................................................7

ARGUMENT ...................................................................................................8

I.   Any Injunction Against Georgians First Would Be Unconstitutional .........9

     a.   No injunction would be content-neutral..............................................12

     b.   No injunction would be remedial against past or threatened unlawful
          conduct ..............................................................................................12

     c.   Leveling the playing field between candidates is not a compelling
          governmental interest .........................................................................14

     d.   Plaintiffs' proposed injunctions are not narrowly tailored..................15

     e.   Any injunction would impermissibly censor protected political
          speech. ...............................................................................................20

II.  Plaintiffs' request is barred by the doctrine of laches. ...............................21

III. The Court should consider reliance interests in crafting any injunction. ...24

CONCLUSION ...............................................................................................25

## INTRODUCTION

There should be no question about it: Plaintiffs' primary purpose in filing this lawsuit is to hamstring Mr. Perdue's political opponent in the final few months before an election. The Court should not take the bait. To do as Plaintiffs ask would be a flagrantly unconstitutional burden on Georgians First's protected First Amendment rights.

Plaintiffs allege that Mr. Perdue is not able to fundraise to the same extent as Governor Kemp because Mr. Perdue is subject to contribution limits whereas Governor Kemp's is effectively exempt due to his ability to chair and coordinate with a leadership committee. Even assuming *arguendo* that this description is accurate or at all constitutionally relevant, the obvious remedy would be to remove the limits which supposedly hold Mr. Perdue back from fundraising.

But that is not what Plaintiffs ask for here. Instead, they ask this Court to issue an injunction prohibiting Georgians First from speaking against Mr. Perdue or in favor of Mr. Perdue's political opponent. Such a blatantly content-based prior restraint on future political speech is anathema to the ideals and rights enshrined in the First Amendment. Indeed, "[t]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco*

- 1 -

*County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)). Existing precedent makes clear that Plaintiffs' desire to "level the playing field" between himself and Governor Kemp is an insufficiently compelling or significant interest to justify such an extreme ban on political speech in the middle of a political campaign, particularly where there is another viable alternative that does not burden speech at all.

The gravamen of the First Amendment is that courts "must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United*, 558 U.S. at 327. Put another way, the constitutional arc always bends towards *more* speech, not less. Plaintiffs' requested relief in this case would amount to an unconstitutional prior restraint on political advocacy that sits at the core of the First Amendment's protections. For that reason, Plaintiffs' request for an injunction should be denied.[1]

## BACKGROUND

### I.    The Statutory Background

On May 4, 2021, Senate Bill 221 (2021)—codified at O.C.G.A. § 21-5-34.2—was signed into law (the "Leadership Committee Statute"), authorizing the creation

---

[1] Given the substantive and critical constitutional issues Georgians First raises in this brief—its first as an actual party to the litigation—the Court should dismiss out of hand any suggestion by Plaintiffs that Georgians First's request for additional briefing was simply a delay tactic to allow Georgians First to run more advertisements. As discussed below, the advertisement Plaintiffs complain of was planned and done in accordance with existing contracts, and Georgians First needed the opportunity to raise the serious issues in this brief with the Court.

of a new type of entity: the leadership committee. A leadership committee can accept contributions and make expenditures for the purpose of affecting the outcome of *any* election and advocating for the election or defeat of *any* candidate. O.C.G.A. § 21-5-34.2(d). In this regard, a leadership committee is similar to an independent committee. Leadership committees can also accept contributions and make expenditures to defray expenses incurred in connection with *any* candidate's campaign for elective office and a public officer's fulfillment or retention of such office, similar to a PAC. *Id.* Thus, a leadership committee can raise and spend funds to support *multiple* candidates, in contrast to a campaign committee.

Georgians First Leadership Committee was formed on June 25, 2021. Georgians First is an independent corporation separately registered with the Georgia Secretary of State's Office. By law, Georgians First is required to be a separate entity from Kemp for Governor, Inc., which is Governor Kemp's campaign committee. *See id.* ("[a] leadership committee shall be a separate legal entity from a candidate's campaign committee…"). While Governor Kemp is its Chairman, Georgians First has an Executive Director and corporate governance.

## II.   Georgians First and Kemp for Governor, Inc. Have Relied on the Leadership Committee Statute

Georgians First has spent the last seven months organizing and planning its 2022 election cycle operations and strategy in reliance on the Leadership Committee

– 3 –

Statute. Ex. 1, Decl. of Miller Lewis ("Lewis Decl.") ¶ 4–5. For example, Georgians
First has already executed and entered into several contracts in reliance on the Lead-
ership Committee Statute. *Id.* ¶ 6. Nearly all these contracts have a term for the entire
2022 primary election cycle. *Id.* ¶ 9. While some contracts have been fully paid,
others are paid over the course of the term of the contract. *Id.* Some of these contracts
also have services that have yet to be rendered. Kemp for Governor cannot simply
take on those contracts either, which are for substantial amounts that Georgians First
has raised money for and budgeted to cover.[2] For example, Georgians First has staff,
contractors, and grassroots operations already engaged for the entirety of the 2022
primary election cycle that were retained in reliance on Georgians First's ability to
operate pursuant to the Leadership Committee Statute. *Id.* ¶ 10. The fact that these
contracts have been executed, however, means that Georgians First has taken on li-
abilities in reliance on the Leadership Committee Statute regardless of the timing for
payment and provision of services. *Id.* ¶ 6.

  Georgians First entered into many of these contracts with the full expectation
that Georgians First would be able to accept contributions and make expenditures

---

[2] As has been noted in this case, Governor Kemp cannot raise money during the
legislative session, hindering the campaign's ability to take on liabilities of Geor-
gians First if this Court enjoins it from making future expenditures supporting Gov-
ernor Kemp's reelection.

for the primary purpose of supporting Governor Kemp's reelection campaign in accordance with the Leadership Committee Statute. *Id.* ¶ 7. Georgians First has websites, social media accounts, and digital media that Georgians First has paid for and that is queued for release that promotes Governor Kemp or opposes Mr. Perdue and other candidates. *Id.* Absent the Leadership Committee Statute, these operations and contracts would likely have been undertaken by Governor Kemp's campaign instead. *Id.*

Likewise, Governor Kemp's campaign has made numerous strategic decisions in reliance on Georgians First's ability to. *See* Ex. 2, Decl. of Bobby Saparow ("Saparow Decl.") ¶ 5. Kemp for Governor, Inc.—Governor Kemp's campaign committee—not only planned and budgeted for the 2022 election cycle in reliance on the Leadership Committee Statute, but has already put many of these plans into motion. *Id.* ¶ 6. Staff have been hired, field operations set up, and grassroots operations prepared for—or not prepared for—in reliance on the Leadership Committee Statute. *Id.* Governor Kemp's campaign also changed its fundraising strategy. Absent the Leadership Committee Statute, Governor Kemp's campaign would have targeted its fundraising efforts on supporters who otherwise gave to Georgians First. *Id.* ¶ 7. Any injunction would now deprive Governor Kemp of that support solely because it was directed to Georgians First rather than the campaign—as the law allowed.

In addition to spending funds in support of Governor Kemp's reelection, Georgians First has also already planned numerous efforts that have other overarching purposes. For example, Georgians First has already contracted to conduct grassroots outreach and voter contact activities that not only promote the election of Governor Kemp, but also help get out the vote for several other candidates. *Id.* ¶ 11. And under the Leadership Committee Statute, Georgians First is able to share information it gathers with candidates without that data constituting an in-kind contribution to those candidates. *Id.*

Candidate qualifying for the 2022 primary election commences on March 7, 2022, which is also the date when voters can begin requesting absentee ballots, and voting begins on April 5, 2022.[3] Thus, it should come as no surprise that in December and the start of this year, Georgians First was entering contracts and allocating funds through the May 24, 2022 primary election for statewide operations, grassroots activities, voter contact/outreach, advertising, and communications. *Id.* ¶ 5. Because leadership committees are not restricted to independent expenditures, Georgians First entered agreements and organized its operations with that in mind. *Id.* ¶ 6.

---

[3] The 2022 election calendar is available at https://sos.ga.gov/admin/uploads/2022_State_Short_Calendar10.pdf.

Although Georgians First is not subject to contribution limits, approximately 70% of the donors to Georgians First have made contributions under the primary election contribution limit of $7,600 for statewide candidates. *Id.* ¶ 13.

## III. Recent Advertisements

Plaintiffs complain about Georgians First's ads about David Perdue, including a digital ad that Georgians First recently released. [Doc. 56]. But Georgians First previously acquired licensed materials to use in ads about David Perdue and hired staff and other consultants to create digital and television ads. Lewis Decl. ¶ 7. Plaintiffs released a television ad last week attacking Governor Kemp. *Id.* ¶ 14. In response, Georgians First released a digital ad about Mr. Perdue. *Id.* Plaintiffs are wrong that Georgians First requested additional briefing so that it could release a new ad—the recent ad about Mr. Perdue was previously planned. *Id.* And Georgians First has planned more digital ads to educate voters about Mr. Perdue over the next four months pursuant to *existing* contracts. *Id.* This is typical in an election; Plaintiffs understand this, which is why they now ask the Court to muzzle Georgians First by prohibiting any advertisements that reference Governor Kemp and Mr. Perdue. Plaintiffs' First Amended Complaint ("FAC") at 26-27.

## ARGUMENT

Plaintiffs' fundamental complaint is that a disparity exists between the fundraising ability of Governor Kemp and Mr. Perdue in their campaign for the Republican nomination for Governor.

Georgians First vehemently disagrees that such a disparity exists or that the mere existence of such a disparity would be, without more, constitutionally relevant. On the one hand, the *expansion* of political free speech rights which the Leadership Committee Statute grants via the removal of contribution limits requires nothing more than rational basis review under the First Amendment. And on the other hand, there is no authority—Plaintiffs have certainly not identified one—suggesting that candidates for office have a First Amendment right to *receive* contributions; rather, the core First Amendment right is the ability to *expend* money. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 24 (1976) ("the primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the *contributor's* freedom of political association.") (emphasis added). Here, there is no restriction on Mr. Perdue's ability to spend money. Moreover, Mr. Perdue is still fully able to coordinate with and receive contributions from any leadership committee, just like Governor Kemp. The only real difference between the two candidates is Mr. Kemp's

ability to *chair* a leadership committee. Fundamentally, that does not arise to the level of a constitutional violation.

Nevertheless, the Court made clear at its February 3, 2022 status conference that it was not interested in revisiting the arguments as to whether a constitutional violation exists in this case. Thus, in this brief Georgians First will instead focus on demonstrating why Plaintiffs' proffered remedy is both fundamentally unconstitutional and overbroad.

## I.    Any Injunction Against Georgians First Would Be Unconstitutional

Any injunction issued against Georgians First would be an unconstitutional prior restraint on protected political speech. A prior restraint is an administrative or judicial order that forbids certain communications when issued in advance of the time that such communications are to occur." *Acella Pharms., LLC v. First Data-Bank, Inc.*, No. 1:17-CV-5013-MHC, 2018 WL 7199992, at *10 (N.D. Ga. June 4, 2018) (Cohen, J.), *vacated for settlement*, No. 1:17-CV-5013-MHC, 2018 WL 7199807 (N.D. Ga. Oct. 4, 2018). "Classic prior restraints have involved judge-issued injunctions against the publication of certain information." *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005); *see also Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) ("Court-ordered injunctions that forbid speech can [ ] be considered prior restraints."); *Alexander v. United States*, 509 U.S. 544, 550

– 9 –

(1993) (A "prior restraint" includes any "judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.").

As this Court has recognized, "[b]ecause a prior restraint censors speech before it occurs, there is a heavy presumption against the constitutionality of prior restraints." *Acella Pharms.*, 2018 WL 7199992, at *10 (Cohen, J.). Indeed, "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Court injunctions that prohibit speech are particularly suspect because "the injunction is enforceable through civil contempt, a summary process without the constitutional protection of a jury trial; and the only defense available to the enjoined party is factual compliance with the injunction, not unconstitutionality[.]" *Lawson v. Murray*, 515 U.S. 1110, 1114 (1995) (Scalia, J., concurring).

Only under certain limited circumstances have prior restraint injunctions been upheld. In order to pass constitutional muster, a prior restraint injunction must be (1) content neutral, (2) remedial to right past or threatened unlawful conduct by the speaker, and (3) "burden no more speech than necessary to serve a significant government interest." *Lucero v. Trosch*, 121 F.3d 591, 602 (11th Cir. 1997) (quoting *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994)); *see also CBS,*

*Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) ("This most extraordinary remedy" of a prior restraint injunction "is appropriate only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures.") (quotations omitted). "And even when a prior restraint may theoretically be permissible, the decree that embodies it must be precisely tailored both to meet the exigencies of the particular case and to avoid censoring protected speech." *Sindi v. El-Moslimany*, 896 F.3d 1, 32 (1st Cir. 2018).

Consequently, "[a]ny system of prior restraints of expression"—particularly political expression on the eve of an election—"comes to this Court bearing a heavy presumption against its constitutional validity." *Acella Pharms.*, 2018 WL 7199992, at *10 (Cohen, J.) (quoting *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971)); *see also Sindi*, 896 F.3d at 32 ("[A] prior restraint on speech must survive the most exacting scrutiny demanded by our First Amendment jurisprudence.").

Here, Plaintiffs seek an injunction that would effectively ban Georgians First from (1) making communications "depict[cing] or referenc[ing] Governor Kemp or Senator Perdue," and (2) making expenditures supporting the reelection of Governor Kemp or opposing the election of Mr. Perdue. There is simply no iteration of any injunction accomplishing these purposes that could overcome the "heavy

presumption against its constitutionality." *Acella Pharms.*, 2018 WL 7199992, at *10 (Cohen, J.).

### a.  No injunction would be content-neutral

All of Plaintiffs' proposed injunctions fail the very first requirement of a prior restraint injunction: they are not content-neutral. In addition to a general injunction banning all activities of Georgians First as a gubernatorial leadership committee—itself impermissibly broad—Plaintiffs also seek an expansive injunction that would prevent Georgians First from not only making any expenditures in support of Governor Kemp's reelection in the future, but also from using already purchased materials for advertisements or communications that "depict or reference Governor Kemp or Senator Perdue[.]" FAC at 26. There can be no clearer example of a *content-based* prior restraint on Georgians First's core First Amendment right to political speech that would otherwise be subject to strict scrutiny. For this reason alone, Plaintiffs' request for an injunction against Georgians First must fail.

### b.  No injunction would be remedial against past or threatened unlawful conduct

Nor would any of Plaintiffs' proposed injunctions remedy past unlawful conduct. Prior restraint injunctions have generally been upheld only in limited circumstance where the injunction was issued to remedy past unlawful conduct, such as where the defendant had engaged in speech that constituted harassment. *See Madsen*,

512 U.S. at 764 n.2 (upholding injunction restricting speech in part because the injunction was issued "because of [defendants'] prior unlawful conduct" harassing an abortion clinic); *Schenck v. Pro–Choice Network*, 519 U.S. 357 (1997) (same).

Here, though, there is no allegation that Georgians First has ever violated the law or, more importantly, that Georgians First's *speech* has ever violated the law. Indeed, all of the activities that Plaintiffs seek to enjoin—*i.e.*, expenditures, advertisements, and communications in support of a political candidate—are squarely protected by the First Amendment.

The only unlawful thing that Plaintiffs complain about in this case is Mr. Perdue's alleged inability to receive unlimited campaign contributions in the same way that Governor Kemp supposedly can through his chairmanship of Georgians First. But to the extent Governor Perdue's First Amendment rights are being violated at all, the burden comes from the campaign contribution limits contained in O.C.G.A. § 21-5-41, *not* the Leadership Committee Statute. Thus, Plaintiffs have not demonstrated that Georgians First has engaged in any unlawful activity or unprotected speech that would warrant a prior restraint injunction against *Georgians First* for its future speech.

– 13 –

### c. Leveling the playing field between candidates is not a compelling governmental interest

Nor would any injunction against Georgians First serve a significant or compelling governmental interest. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." Thus, the constitutional default is *unlimited* political speech and only a sufficiently compelling governmental interest can alter that status quo. "[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 496 (1985); *see also Davis v. Fed. Election Comm'n,* 554 U.S. 724, 741 (2008) (same).

Given that the constitution always prefers *more* speech, not less,[4] the natural remedy would be for Plaintiffs to seek an injunction against the one thing preventing Mr. Perdue from receiving unlimited contributions: the contribution limits contained in O.C.G.A. § 21-5-41. It would then be up to the courts to weigh the anticorruption interests of the contribution limits against the interests in having an equalized ability to fundraise. And in such a case, Plaintiffs might argue that passage of the Leadership Committee Statute calls into question the State's anticorruption justifications for the

---

[4] *See Citizens United*, 558 U.S. at 327 ("First Amendment standards … must give the benefit of any doubt to protecting rather than stifling speech.").

contribution limits. But that is a problem for the *contribution limits* that limit Mr. Perdue's political speech, not for the Leadership Committee Statute that *expands* the political speech of others.

Of course, Plaintiffs do not challenge the contribution limits here. Perhaps because Mr. Perdue does not actually have as much support as he suggests, he instead seeks to *restrain* his opponent's speech. But Plaintiffs have not identified any governmental interest that would justify issuing a prior restraint against Georgians First's protected political speech. The Supreme Court was very clear in *Davis* and *Buckley* that "leveling the playing field" between two political candidates is not a sufficiently important government interest to warrant muzzling political speech. *See Davis*, 554 U.S. at 741; *Buckley*, 424 U.S. at 56–57 (holding that "[t]he interest in equalizing the financial resources of candidates" did not provide a "justification for restricting" candidates' overall campaign expenditures").

Because Plaintiffs have not identified any sufficiently compelling government interest in enjoining Georgians First's political speech—as none exists—Plaintiffs' motion must fail.

### d.  Plaintiffs' proposed injunctions are not narrowly tailored

Even if "leveling the playing field" between Governor Kemp and Mr. Perdue were a sufficiently compelling interest to warrant a prior restraint on Georgians

First's political speech, Plaintiffs' proposed injunctions are far too broad. To avoid running afoul of the constitution, prior restraint injunctions must be "precisely tailored," *Sindi*, 896 F.3d at 32, and must "burden no more speech than necessary to serve a significant government interest." *Lucero*, 121 F.3d at 602. This also reflects the general requirement that

> [i]n the case of a constitutional violation, injunctive relief must be tailored to fit the nature and extent of the established violation. In other words, the injunction must be *no broader than necessary to remedy the constitutional violation*. When a district court fails to follow this principle and drafts an unnecessarily broad injunction, the district court abuses its discretion.

*Georgia Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (citations and quotations omitted, emphasis added).

Plaintiffs first seek a broad injunction invalidating the entirety of the Leadership Committee Statute with regard to gubernatorial committees. *See* FAC, Prayer for Relief §§ A–B. But such a broad injunction is only warranted where "'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

But even assuming that a constitutionally-relevant discrepancy exists between Mr. Perdue and Governor Kemp, there are clearly other circumstances in which a gubernatorially chaired leadership committee could serve other ends that do not implicate such a concern. For example, if an incumbent governor wins his party's nomination, there would be no constitutional question because his opponent in the general election could also chair a leadership committee. Gubernatorial leadership committees can also support *any other* candidate, which likewise does not raise any constitutional concerns. Thus, any order enjoining the Leadership Committee Statute on its face (either generally or regarding all of Georgians First's activities) must fail.

But even Plaintiffs' proposals specific to the present campaign between Governor Kemp and Mr. Perdue still burden far more speech than is necessary to remedy Plaintiffs' alleged harm. As has been explained before, Plaintiffs' primary interest in this litigation is to "level the playing field," so to speak, between Mr. Perdue and Governor Kemp. Here, there are two possible ways to remedy that alleged wrong: grant Mr. Perdue more speech on the one hand or restrict Georgians First on the other. Either option will "level the playing field" between Mr. Perdue and Governor Kemp. Plaintiffs want the Court to choose the options that *most* restrict Georgians First's speech. But where there are other options to remedy a harm that do not burden protected speech, an injunction which chooses to instead burden political speech is

unconstitutional. *See Schenck*, 519 U.S. at 377 (striking injunction because it "burdened more speech than was necessary to serve the relevant government interests.").

Moreover, Plaintiffs' proposed injunctions that would purport to limit Georgians First from doing activities in support of Governor Kemp would be impermissibly vague. *See* Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction and every restraining order must … state its terms specifically; and describe in reasonable detail … the act or acts restrained or required.) (cleaned up). "[T]he specificity requirements of Rule 65(d) are designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir.2012) (quotations omitted). Plaintiffs' proposal that Georgians First be prohibited from expending funds "supporting the election" of Governor Kemp could potentially encompass numerous otherwise protected activities. For example, Georgians First has plans (including executed contracts) to engage in data gathering and voter contacting campaigns that would inure to the benefit of multiple candidates, not just Governor Kemp. It is not clear whether or not such activity would constitute "supporting the election" of Governor Kemp, thereby chilling Georgians First's otherwise protected speech.

Moreover, the Court has indicated multiple times—both at the hearing on Plaintiffs' motion and at the recent status conference—that it would not enjoin already existing contracts. But there remains an open question as to whether Georgians First would still be able to fully utilize already existing contracts to fulfill their primary purpose: the reelection of Governor Kemp. Indeed, Plaintiffs want the Court to issue an injunction prohibiting Georgians First from running advertisements on *already purchased* airtime.[5] FAC at 26. Digital advertisements and social media, by contrast, do not involve pre-purchased airtime, but do involve already existing contracts for content creation. *See* Lewis Decl. ¶¶ 7–9. Whether creating new content to fulfill already existing contracts would constitute an "expenditure" for the purpose of "supporting" Governor Kemp is an unanswered question.[6]

In short, Plaintiffs' requested remedies are not narrowly tailored to protect Plaintiffs' claimed interests, they burden far more speech than is necessary, and

---

[5] Such an injunction would, of course, constitute an impermissible prior restraint on protected speech, as discussed above.

[6] The perfect example of this is Plaintiffs' exasperation at Georgians First's recent advertisement. [Doc. 56] at 5–6. Plaintiffs claim that Georgians First's request for additional briefing was merely a way to "seek[] delay to take advantage of Georgia's unconstitutional scheme as long as possible." *Id.* at 6. This is plainly not true. The digital advertisement was long planned and was issued pursuant to an already existing contract. Lewis Decl. ¶ 14. But it is a good illustration of the potential conflicts that would inevitably erupt from Plaintiffs' proposed injunction.

would leave Georgians First guessing as to what it is and is not able to moving forward. Accordingly, Plaintiffs' request should be denied.

### e. Any injunction would impermissibly censor protected political speech.

Each of Plaintiffs' proposed injunctions seeks to restrain political speech that is at the core of the First Amendment. "The First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (quoting *Eu*, 489 U.S. at 223). Indeed, there is "a rough hierarchy in the constitutional protection of speech. Core political speech occupies the **highest, most protected position**." *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1229 (11th Cir. 2006) (quoting *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 422 (1992)).

"For these reasons, political speech must prevail against laws that would suppress it," and government actions that "burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United*, 558 U.S. at 340 (quoting *Federal Election Commn v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007)).

Here, the Plaintiffs seek an injunction prohibiting Georgians First not only from making expenditures in favor of Governor Kemp, but also from making

*advertisements or communications* either mentioning or depicting Governor Kemp or Mr. Perdue during the campaign for the Republican gubernatorial nomination (and beyond). Such activity is quintessentially political speech that is at the center of First Amendment protections. Thus, none of Plaintiffs' proposed injunctions could "avoid censoring protected speech," and should be denied. *Sindi*, 896 F.3d at 32.

## II.   Plaintiffs' request is barred by the doctrine of laches.

Plaintiffs' request is also barred by the doctrine of laches. Laches is an affirmative defense that "serves to bar suit by a plaintiff 'whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1283 (11th Cir. 2015) (quoting *Russell v. Todd*, 309 U.S. 280, 287 (1940)). Laches may apply to bar an injunction as well as suit for damages. *See Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 698 F.3d 9, 20 (1st Cir. 2012). To demonstrate laches, a defendant must prove three things: "(1) there was a delay in asserting a right or claim, (2) the delay was not excusable, and (3) the delay caused [a defendant] undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005).

The Fourth Circuit has decided a case substantively on point. In *Perry v. Judd*, 471 F. App'x 219 (4th Cir. 2012), candidates seeking the Republican nomination for President alleged that Virginia's rules limiting circulation of candidate petitions to

only people eligible to register to vote and requiring 10,000 signatures violated the First and Fourteenth Amendments to the Constitution. *Id.* The candidates sought an injunction adding their names to the ballot. *Id.* The district court denied the injunction in part because of the doctrine of laches, and the Fourth Circuit affirmed. *Id.* at 220. In doing so, the Fourth Circuit found that the main plaintiff-candidate had a cognizable injury beginning on the day that he declared his candidacy, but that he waited four months before bringing his challenge on the eve of the filing deadline. *Id.* at 224. The Fourth Circuit found this delay inexcusable. *Id.* at 224–26.

Likewise, Plaintiffs inexcusably delayed in bringing their suit. Mr. Perdue announced his candidacy on December 6, 2021. FAC ¶ 8. The passage of the Leadership Committee Statute in May 2021 was well publicized months before Mr. Perdue announced his candidacy.[7] The creation and incorporation of Georgians First in June 2021 was similarly well publicized months before Mr. Perdue announced his candidacy.[8] Mr. Perdue had every opportunity and incentive to file his lawsuit on the very

---

[7] James Salzer, *Kemp signs bill giving big-money donors more impact on key races*, ATLANTA JOURNAL-CONSTITUTION, May 10, 2021, https://www.ajc.com/politics/kemp-expected-to-sign-bill-giving-big-money-donors-more-impact-on-key-races/TZKSYRCHP5EE3C2RTEUMAKTXUA/.

[8] James Salzer, *Kemp the first to set up newly legal unlimited donation committee*, ATLANTA JOURNAL-CONSTITUTION, Aug. 1, 2021, https://www.ajc.com/politics/kemp-the-first-to-set-up-newly-legal-unlimited-donation-committee/X36LZUQJFFE3NBE4PPY2GQYXDU/

first day he announced his candidacy because it would have prevented much of the alleged harm he says he wants to prevent. But instead, Plaintiffs decided to wait until Thursday, January 6, 2022—***one business day*** before the state legislative session began and Governor Kemp would be prohibited from fundraising. Such a delay is simply inexcusable. *See Perry*, 471 Fed. Appx. at 224 ("Movant had every incentive to challenge the requirement at [the time he announced his candidacy] … Nevertheless, he chose to sit on his right to challenge this provision until after he had been denied a place on the ballot. This deliberate delay precludes the possibility of equitable relief.").

Plaintiffs' strategic delay also seriously prejudices Governor Kemp and Georgians First. Georgians First and Governor Kemp's campaign have made strategic decisions, targeted their fundraising efforts, and entered into contracts all in reliance on the Leadership Committee Statute. *See generally* Lewis Decl. and Miller Decl. Had Plaintiffs simply been diligent in filing their claims on the day that Mr. Perdue announced his candidacy at the beginning of December, Georgians First and Governor Kemp would have made different decisions. Because Plaintiffs' inexcusable delay has caused undue prejudice to Georgians First, Plaintiffs' suit should be barred by the doctrine of laches.

### III.   The Court should consider reliance interests in crafting any injunction.

To be sure, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (internal quotation marks omitted). Should the Court find that a constitutional violation exists and that restricting Georgians First's First Amendment protected political speech is a justified remedy in response to that harm—neither are true—then the Court should carefully consider the reliance interests Georgians First and Governor Kemp's campaign have incurred in crafting any injunction.

Georgians First has entered into contracts with continuing liabilities in reliance on the Leadership Committee Statute. Governor Kemp's campaign has also made strategic decisions in reliance on Georgians First's ability to fundraise and make expenditures in support of Governor Kemp's reelection. Many contributions that have gone to Georgians First—approximately 70% of which have been under the campaign contribution limit of $7,600—could have gone to Governor Kemp's campaign instead. Lewis Decl. ¶ 13. Enjoining Georgians First from making expenditures in support of Governor Kemp would not only hamstring Georgians First and Governor Kemp moving forward but would also do so retroactively. Such an injunction would go far beyond remedying any purported harm to Plaintiffs and would

begin to place Georgians First in the position of deciding between being sued for failing to live up to their contractual obligations, foregoing the benefit of the bargain of their contracts (through no wrongdoing of their own), or contempt of Court.

If the Court nevertheless decides that some injunction is necessary, it should tailor such prospective relief to the specific statutory disparity that is the heart of Plaintiffs' First Amendment claim, although such an injunction would still be unlawful for many of the reasons explained above. Lastly, should the Court decide that an injunction is warranted in this case, Georgians First respectfully requests that the Court stay its injunction pending appeal.

## CONCLUSION

For the reasons stated above, as well as those stated in the State's opposition brief, the Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 7th day of February, 2022,

/s/ Vincent F. Russo
Vincent F. Russo (GA Bar 242628)
Edward A. Bedard (GA Bar 926148)
Carey A. Miller (GA Bar 976240)
ROBBINS ROSS ALLOY
    BELINFANTE LITTLEFIELD LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
T:  (678) 701-9381
F:  (404) 856-3255
E:  vrusso@robbinsfirm.com
    ebedard@robbinsfirm.com

– 25 –

cmiller@robbinsfirm.com

*Counsel for Georgians First*
*Leadership Committee, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, I hereby certify that this motion has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1C.

This 7th day of February, 2022.

/s/ *Vincent F. Russo*
Vincent F. Russo (GA Bar 242628)

ROBBINS ROSS ALLOY
    BELINFANTE LITTLEFIELD LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
T: (678) 701-9381
F: (404) 856-3255
E: vrusso@robbinsfirm.com

*Counsel for Georgians First*
*Leadership Committee, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this day, I caused a true and correct copy of the foregoing document to be filed with the clerk's office using this Court's CM/ECF system, which will automatically send notice of such filing to all counsel of record.

This 7th day of February, 2022.

*/s/ Vincent F. Russo*
Vincent F. Russo (GA Bar 242628)

ROBBINS ROSS ALLOY
    BELINFANTE LITTLEFIELD LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
T: (678) 701-9381
F: (404) 856-3255
E: vrusso@robbinsfirm.com

*Counsel for Georgians First*
*Leadership Committee, Inc.*