# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**DAVID PERDUE; and PERDUE FOR GOVERNOR, INC.,**

      **Plaintiffs,**

**v.**

**BRIAN KEMP, in his personal capacity and in his official capacity as the Governor of Georgia; CHRISTOPHER M. CARR, in his official capacity as the Attorney General of Georgia; JAMES D. KREYENBUHL, in his official capacity as Chairman of the Georgia Government Transparency and Campaign Finance Commission; ERIC L. BARNUM, in his official capacity as Vice Chair of the Georgia Government Transparency and Campaign Finance Commission; ROBERT A. WATTS, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; DARRYL HICKS, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; RICK THOMPSON, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; and**

**CIVIL ACTION FILE**

**NO. 1:22-CV-0053-MHC**

**GEORGIANS FIRST LEADERSHIP
COMMITTEE, INC.,**

**Defendants.**

## ORDER

This matter is before the Court on Plaintiffs David Perdue ("Perdue") and

Perdue for Governor, Inc.'s Motion for a Preliminary Injunction and Amended

Motion for a Preliminary Injunction. Pls.' Mot. for a Prelim. Inj. and Incorporated

Mem. of Law ("Pls.' Mot.") [Doc. 2]; Pls.' Am. Mot. for a Prelim. Inj. and

Incorporated Mem. of Law ("Pls.' Am. Mot.") [Doc. 54].

## I.    BACKGROUND

### A.    The Law Authorizing the Creation of Leadership Committees

On July 1, 2021, a state law became effective which provides a new

mechanism by which certain Georgia public office holders may obtain

contributions for elective office. Ga. Laws 2021, Act 219, eff. July 1, 2021. The

new law, codified at O.C.G.A. § 21-5-34.2, provides, in pertinent part, that "[a]

leadership committee may accept contributions or make expenditures for the

purpose of affecting the outcome of any election or advocating for the election or

defeat of any candidate . . . ." O.C.G.A. § 21-5-34.2(d). A "leadership committee"

is defined as follows:

2

> [A] committee, corporation, or organization chaired by the Governor, the Lieutenant Governor, the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated, or the nominee of a political party for Lieutenant Governor selected in a primary election in the year in which he or she is nominated. Such term shall also mean up to two political action committees designated by the majority caucus of the House of Representatives, the minority caucus of the House of Representatives, the majority caucus of the Senate, and the minority caucus of the Senate. No person may chair more than one leadership committee.

O.C.G.A. § 21-5-34.2(a). A leadership committee is required to disclose contributions or expenditures in excess of $500.00 and may accept contributions without monetary limitation:

> A leadership committee which accepts contributions or makes expenditures in excess of $500.00 shall register with the [Georgia Government Transparency and Campaign Finance] commission within ten days of such accepted contribution or such expenditure and, thereafter, shall file disclosure reports pursuant to the schedule defined for candidates and campaign committees in subsection (c) of Code Section 21-5-34. Such disclosure reports shall be made pursuant to subsection (b) of Code Section 21-5-34. The contribution limits in Code Section 21-5-41 shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of named candidates.

O.C.G.A. § 21-5-34.2(e). A leadership committee is considered "a separate legal entity from a candidate's campaign committee and shall not be considered an independent committee."[1] Id. § 21-5-34.2(f).

---

[1] An "independent committee" is "any committee . . . other than a campaign committee, political party, or political action committee, which receives donations

**B.     Distinctions Between Contributions and Expenditures Made by a Leadership Committee and a Campaign Committee**

There are some significant differences between contributions and

expenditures that are made to and from a campaign committee and a leadership

committee under Georgia law:

- A campaign committee can be established to raise money for any candidate for statewide public office, but a leadership committee can be chaired only by a sitting Governor or Lieutenant Governor, or a political party's nominee for Governor or Lieutenant Governor; additionally, up to two such committees also can be established by the majority and minority caucuses of the Georgia Senate and Georgia House of Representatives. Compare O.C.G.A. § 21-5-34(a) with O.C.G.A. § 21-5-34.2(a).

- Candidates for statewide office and their campaign committees are limited in the amount of contributions they may obtain from an individual contributor.[2]  O.C.G.A. § 21-5-41(a).   Prior to the

during a calendar year from persons who are members or supporters of the committee and which expends such funds either for the purpose of affecting the outcome of an election for any elected office or to advocate the elections or defeat of any particular candidate." O.C.G.A. § 21-5-3(15).

[2] Although the maximum allowable contribution in the last amendment affecting the statutory contribution limits was $5,000 for a primary election and $3,000 for a primary runoff election, Ga. Laws 2000, p. 1491 (eff. Jan. 1, 2001), codified at O.C.G.A. § 21-5-41(a)(1) & (2), "the contribution limitations in this Code section shall be raised or lowered in increments of $100.00 by regulation of the [Georgia Government Transparency and Campaign Finance] commission pursuant to a determination by the commission of inflation or deflation during such cycle or four-year period, as determined by the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor, and such limitations shall apply until next revised by the commission." O.C.G.A. § 21-5-41(k).  The current contribution limits for candidates for statewide elected office

enactment of O.C.G.A. § 21-5-34.2, sitting Governors and Lieutenant Governors and their campaign committees, and party nominees for those positions, had the same maximum limit on the amount of contributions as other candidates for statewide office; however, based upon O.C.G.A. § 21-5-34.2(e), those contribution limits no longer apply to those individuals should they collect money through a leadership committee.

- Candidates for statewide office and their campaign committees may not seek or accept a campaign contribution during a legislative session, O.C.G.A. § 21-5-35(a), but no such restriction is imposed upon a leadership committee chaired by a sitting Governor or Lieutenant Governor.

Both prior to and after the enactment of O.C.G.A. § 21-5-34.2, independent committees could raise and expend funds to influence the election of a candidate for statewide office without any limitation on the amount of contributions or expenditures, with the restriction that the independent committees cannot coordinate their activities with an individual candidate or his or her campaign committee. See O.C.G.A. § 21-5-3(15) (defining an "independent committee" as one which expends funds "either for the purpose of affecting the outcome of an election for any elected office or to advocate the election or defeat of any particular candidate."); Ga. Comp. R. & Regs. r. 189-6-.04 ("Campaign contribution limits

---

are $7,600 for a primary election and $4,500 for a primary runoff election. See GEORGIA GOVERNMENT TRANSPARENCY & CAMPAIGN FINANCE COMMISSION, www.ethics.ga.gov/contribution-limits (last visited Feb. 4, 2022).

on contributions to candidates do not apply to independent expenditures made to influence candidate elections. An independent expenditure is an expenditure for a communication which expressly advocates the election or defeat of a clearly identified candidate but which is made independently of any candidate's campaign.").

In other words, under the Georgia law in existence prior to the enactment of O.C.G.A. § 21-5-34.2, the maximum amount of a contribution to an incumbent holding the office of Governor of Georgia or to his or her campaign committee for a primary election is $7,600, and the law prohibits the Governor from seeking or accepting any such contributions during a session of the Georgia General Assembly. Other candidates for Governor who are not current statewide office holders or members of the General Assembly have the same maximum contribution limit of $7,600 for a primary election but may seek and accept contributions during the legislative session. Under the provisions of O.C.G.A. § 21-5-34.2, the sitting Governor, through his leadership committee, may seek and accept contributions for a primary election in an unlimited amount both during and after the legislative session. It is undisputed that, for the 2022 Georgia primary election, the application of O.C.G.A. § 21-5-34.2 results in Governor Kemp being the only incumbent running for statewide office who chairs a leadership committee

that is not subject to the campaign contribution limits of O.C.G.A. §§ 21-5-41(a)(1) and (2) or the prohibition of seeking or receiving campaign contributions during the 2022 regular session of the Georgia General Assembly.[3]

### C.   Governor Kemp Establishes the Georgians First Leadership Committee and Perdue Announces His Gubernatorial Bid

On July 8, 2021, or seven days after the effective date of O.C.G.A. § 21-5-34.2, the Georgians First Leadership Committee, Inc., ("Georgians First") was established, with Governor Kemp as its chairperson.  Verified Compl. ("Compl.") [Doc. 1] ¶ 7.  On December 6, 2021, former United States Senator David Perdue announced his intent to run for Governor of Georgia in 2022.  Id. ¶ 8.

### D.   The Complaint

On January 6, 2022, one month after Perdue's announcement that he intended to run for Governor, Perdue and Perdue for Governor, Inc. filed their Complaint seeking declaratory and injunctive relief.  Compl.  The Complaint alleges that O.C.G.A. § 21-5-34.2 "undermines the even-handed campaign contribution regime" previously established under Georgia law, and that Governor Kemp, through Georgians First, can now "out-raise and out-spend his primary and

---

[3] It is also undisputed that the only other incumbent office holder who could have established a similar leadership committee would have been Lieutenant Governor Geoff Duncan, but he is not running for re-election.

general election challengers for months." Id. ¶¶ 38, 42.  More specifically, the

Complaint alleges as follows:

> Under Georgia's restrictions on campaign contributions for primary challengers, which require Senator Perdue to raise funds in amounts of not more than $7,600 for the primary and $4,500 for a potential primary runoff, Senator Perdue must spend more time and resources raising money and ultimately cannot raise and spend as much money in the primary as the incumbent Governor Kemp.  This undermines Senator Perdue's ability to spread his campaign message in the same manner as Governor Kemp and puts Senator Perdue at a significant competitive disadvantage in the Republican gubernatorial primary.

Id. ¶ 30.  The Complaint also enumerates a number of "attack ads" that have been

run on various media by Georgians First against Perdue, purportedly causing harm

to Perdue for the upcoming Georgia Republican Primary Election.  Id. ¶¶ 43-45.

Perdue seeks relief from this Court based upon an alleged violation of the First

Amendment due to the fact that O.C.G.A. § 21-5-34.2 permits Governor Kemp to

raise funds through Georgians First without monetary limitation and that Perdue

will not "be able to compete on an equal fundraising and campaign spending

footing with Governor Kemp.  That is, Senator Perdue will not have the

opportunity to promote his message and exercise his First Amendment rights to the

same extent as Governor Kemp in the primary election."  Id. ¶¶ 48-57.  Perdue also

contends that O.C.G.A. § 21-5-34.2 denies him equal protection because of the

"uneven and discriminatory contribution limits" between the new statute and the

limits imposed upon campaign committees.  Id. ¶¶ 59-64.  Perdue seeks to have

this Court preliminarily enjoin "the activity of any gubernatorial leadership

committee" established under O.C.G.A. § 21-5-34.2.  Defs.' Mot. at 24; Compl.,

Prayer for Relief, ¶ B.

Prior to the hearing on the motion for a preliminary injunction, there were

two amicus curiae briefs filed with the permission of the Court: (1) one on behalf

of Georgians First, the leadership committee chaired by Governor Kemp, opposing

all preliminary injunctive relief [Doc. 45], and (2) one on behalf of A Strong

Georgia, Inc. and Advancing Conservative Values, Inc., two leadership committees

of the majority caucus of the Georgia House of Representatives, who oppose any

facial challenge to O.C.G.A. § 21-5-34.2 that might impact the authorization to

create leadership committee for legislative caucuses; these amici take no position

on Plaintiffs' as-applied challenge to Georgians First [Doc. 32-1].

### E.    The Hearing and Additional Filings

This Court conducted a hearing on Plaintiff's Motion for a Preliminary

Injunction on January 31, 2022, at which all parties were represented and counsel

for amici were present.  Minute entry [Doc. 46].  Although the Complaint seeks a

declaration that O.C.G.A. § 21-5-34.2 "is unconstitutional both on its face and as

applied to leadership committees chaired by the incumbent Governor of Georgia,"

9

Compl. Prayer for Relief ¶ A, Plaintiffs' Motion for a Preliminary Injunction states

that "Senator Perdue is not challenging [O.C.G.A. § 21-5-34.2] with respect to

leadership committees chaired by the majority and minority caucuses of the House

of Representatives and Senate." Pls.' Mot. at 5 n.2.  At the January 31, 2022,

hearing on Plaintiffs' motion, Plaintiffs conceded that, for purposes of the motion,

they were seeking an injunction only with respect to future expenditures made by

Georgians First on behalf of the re-election of Governor Kemp.  The Court noted

that, from its perspective, the scope of any preliminary injunctive relief likely

would be limited to Georgians First, which was not then a party to the Complaint.

The Court granted Plaintiff until the close of business on February 1, 2022, to file

an amended complaint to add Georgians First as a party to the litigation.  The

Court also provided additional time for the original Defendants (hereinafter

referred to as "State Defendants") to file a supplement to their response in

opposition to the motion for a preliminary injunction and for Plaintiffs to file any

reply thereto.  Minute Entry [Doc. 46].

On February 1, 2022, Plaintiffs filed their Amended Complaint adding

Georgians First Leadership Committee, Inc. as a party defendant as well as naming

Governor Kemp in his personal capacity.  Am. Verified Compl. ("Am. Compl.")

[Doc. 47] ¶¶ 15, 21-23.  The only other substantive change in the Amended

Complaint was in the Prayer for Relief, where Plaintiffs seek to enjoin various activities of Georgians First with respect to expenditures made in furtherance of Governor Kemp's re-election or in opposition to Perdue.  Id., Prayer for Relief.

On February 3, 2022, Georgians First filed a Motion for Renewed Briefing and another hearing on Plaintiff's Motion for a Preliminary Injunction.  Georgians First Mot. for Renewed Briefing [Doc. 49].  In its motion, Georgians First asserts that it "has not had a meaningful opportunity to respond to Plaintiffs' request for injunctive relief, as currently constituted."  Id. at 5.  That same day, the Court conducted a conference call with all parties.  Minute Entry [Doc. 55].  In that call, counsel for Georgians First admitted that Georgians First had notice of the motion for preliminary injunction at least a couple of days prior to the filing of its amicus curiae brief on January 29, 2022, was present for the January 31, 2022, hearing, and there were no factual disputes in this case aside from the issue of whether Plaintiffs could establish irreparable harm.  Counsel for Georgians First also could not identify any specific additional material evidence for presentation at a second preliminary injunction hearing.  Although the Court finds that no additional notice was required with respect to Georgians First under Rule 65 of the Federal Rules of Civil Procedure, the Court permitted Georgians First to file a supplement to its previously filed brief by February 7, 2022.  Minute Entry [Doc. 55].  The Court

also provided Plaintiffs with an opportunity to amend their motion for a preliminary injunction in light of their Amended Complaint.  Id.

On February 3, 2022, State Defendants filed their supplemental response in opposition to Plaintiffs' Motion for a Preliminary Injunction.  State Defs.' Suppl. Br. [Doc. 52].  On February 4, 2022, Plaintiffs filed an Amended Motion for a Preliminary Injunction which does not add anything of substance to their original motion but acknowledges the filing of the Amended Complaint and the injunctive relief sought against Georgians First.  Am. Mot. for a Prelim. Inj.  Finally, on February 7, 2022, Georgians First filed its supplemental brief.[4]  Br. of Def. Georgians First Leadership Comm. in Opp'n to Pls.' Am. Mot. ("Georgians First's Br.") [Doc. 57].  The Court has considered all of the filings in this case.

## II.   STANDING

Before considering the merits of the parties' substantive arguments, the Court must first consider whether Plaintiffs have standing to challenge the

---

[4] Much of Georgian First's additional arguments focus on the breadth of Plaintiffs' requested preliminary injunctive relief and the negative impact such relief would have on contracts already executed by Georgians First (including some prior contacts as to which all amounts have not yet been fully paid).  These arguments are irrelevant because, as is discussed below, the preliminary injunction entered by this Court will have no effect on any contract executed prior to the date of the injunction regardless of when payment is scheduled to be made.

constitutionality of O.C.G.A. § 21-5-34.2, as applied to Governor Kemp's

leadership committee, Georgians First.  Article III of the United States Constitution

expressly limits federal jurisdiction to "cases and controversies" and does not

permit federal courts to issue advisory opinions.  Miller v. F.C.C., 66 F.3d 1140,

1145 (11th Cir. 1995) (citing Flast v. Cohen, 392 U.S. 83, 94-96 (1968)).  "To

have a case or controversy, a litigant must establish that he [or she] has standing,"

United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019), which requires the

litigant to show (1) an injury in fact that (2) is fairly traceable to the challenged

action of the defendant and (3) is likely to be redressed by a favorable decision.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992).  The three components

form an "irreducible constitutional minimum."  Id. at 560.  "The party invoking

federal jurisdiction bears the burden of establishing these elements," which, at the

initial pleading stage, may be established based on "general factual allegations of

injury."  Id. at 561.

State Defendants argue that Plaintiffs fall short of carrying their burden on

all three elements to establish standing.  Defs.' Opp'n to Pls.' Mot. for a Prelim.

Inj. ("Defs.' Opp'n") [Doc. 33] at 8-11.  The Court will consider State Defendants'

arguments *seriatim*.

## A.    Injury in Fact

State Defendants maintain that Plaintiffs' injury is speculative as Plaintiffs are complaining that Governor Kemp's advertisements are damaging Perdue by mischaracterizing his experience and government service, and argue that Plaintiffs do not support these claims with any factual allegations that Perdue's campaign is impaired, harmed, or that voters are forming opinions about his candidacy based on the advertisements.  Defs.' Opp'n at 8-9 (citing Klayman v. President of United States, 689 F. App'x 921, 923 (11th Cir. 2017) ("We will not speculate concerning the existence of standing; if the plaintiff fails to meet his burden, we cannot create jurisdiction by embellishing a deficient allegation of injury.")).  State Defendants further argue that any claim that Plaintiffs are harmed because O.C.G.A. § 21-5-34.2 affects Perdue's freedom of speech and association fails to allege an injury in fact because Plaintiffs have not plausibly alleged that O.C.G.A. § 21-5-34.2 affects Perdue's speech or association.  Id. at 9 n.9.

In order to suffer an "injury in fact," (1) the injury "must be an invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite," (2) "there must be a causal connection between the injury and the challenged action of the defendant that is not too attenuated," and (3) "it must be likely rather than speculative that the injury will be redressed by a

favorable decision." Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999) (citations and punctuation omitted). Plaintiffs contend that they are harmed in a concrete and particularized way and the harm is actual and imminent, not conjectural or hypothetical. Pls.' Reply in Supp. of Their Mot. for a Prelim. Inj. [Doc. 39] at 2-4. Plaintiffs argue that Perdue's First Amendment and Equal Protection Rights are harmed by the campaign finance scheme established by O.C.G.A. § 21-5-34.2 in which Governor Kemp is able to accept unlimited contributions through Georgians First and use those funds to further his primary campaign, while Perdue's ability to raise money for his primary campaign is limited by O.C.G.A. § 21-5-41(a) to $7,600 per individual contributor. Id. Indeed, as pleaded in the Complaint and Amended Complaint, the unequal contribution limits created by O.C.G.A. § 21-5-34.2 within the same primary election harm Perdue's ability to promote his candidacy and benefit his campaign committee. Compl. ¶¶ 29-31; Am. Compl. ¶¶ 32-34.

The Court agrees with Plaintiffs that they have alleged an injury in fact. This precise issue was addressed by the Supreme Court in Davis v. Fed. Election Comm'n, 554 U.S. 724, 729 (2008). That case involved a challenge to a federal statute providing that when a self-financing candidate expends more than $350,000 in personal funds, a competing candidate may raise three times the normal limit on

15

contributions from individual donors.  The Supreme Court found that the unequal

treatment afforded by the statute was an injury sufficient to confer standing to a

self-funded candidate to file a First Amendment challenge:

> Section 319(a) would shortly burden his expenditure of personal funds
> by allowing his opponent to receive contributions on more favorable
> terms, and there was no indication that his opponent would forgo that
> opportunity.  Indeed, the record at summary judgment indicated that
> most candidates who had the opportunity to receive expanded
> contributions had done so.  In these circumstances, we conclude that
> Davis faced the requisite injury from § 319(a) when he filed suit and
> has standing to challenge that provision's asymmetrical contribution
> scheme.

Id., 554 U.S. at 734-35.

Similarly, in this case, as a candidate in the same primary election as

Governor Kemp, Perdue has suffered an injury in fact by his inability to receive

unlimited contributions in the same manner as Governor Kemp through Georgians

First, a leadership committee created in accordance with O.C.G.A. § 21-5-34.2.

**B.      Traceability**

"To satisfy the causation requirement of standing, a plaintiff's injury must

be 'fairly traceable to the challenged action of the defendant and not the result of

the independent action of some third party not before the court.'" Jacobson v. Fla.

Sec'y of State, 974 F.3d 1236, 1253 (11th Cir, 2020) (quoting Lujan, 504 U.S. at

560).  State Defendants argue that Plaintiffs have not alleged a causal connection

between the alleged injury and the alleged conduct; more specifically, State

Defendants assert that "Perdue has not plausibly alleged that he would be subject

to fewer advertisements were [O.C.G.A. § 21-5-34.2] not the law." Defs.' Opp'n

at 9. However, the principal constitutional injury alleged by Plaintiffs is not the

quantity of negative advertisements but the inequitable scheme which permits

Governor Kemp to raise funds not subject to the individual contribution limits

established by O.C.G.A. § 21-5-41(a), while Perdue remains subject to those limits

in the same primary election. The Court finds that Plaintiffs have alleged an injury

that is traceable to the unequal campaign finance scheme established by O.C.G.A.

§ 21-5-34.2.

### C.   Redressability

Finally, State Defendants contend that even if Plaintiffs can establish

causation, no order from this Court could redress his speculative injuries because

he would still be subject to campaign advertisements. Defs.' Opp'n at 10-11.

Plaintiffs must prove that there is a substantial likelihood that their injuries would

be redressed by a favorable decision on the merits. See Clapper v. Amnesty Int'l,

USA, 568 U.S. 398, 414 (2013) (holding that it must be likely, not merely

speculative, that the injury will be redressed by a favorable decision). Relief that

prevents or deters violations from reoccurring satisfies the redressability

requirement. <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 185 (2000).

Plaintiffs have requested an order to enjoin the activity of any gubernatorial leadership committee established under O.C.G.A. § 21-5-34.2 from making expenditures supporting the election of the incumbent Governor. Am. Compl., Prayer for Relief, ¶ B. Such relief would redress their alleged injury—being limited to a statutory maximum contribution at the same time their opponent is able to raise unlimited amounts of contributions—by an order that would place both the incumbent and his challengers under the same contribution limitation for the primary election.

Because the injury in fact, traceability, and redressability requirements are satisfied, Plaintiffs have standing to bring this action.

## III.   WHETHER GEORGIANS FIRST IS AN INDISPENSABLE PARTY

In their original response, State Defendants asserted that Plaintiffs' claims fail because Plaintiffs failed to name Georgians First as a Defendant in this case. Defs.' Opp'n at 11.

> "The purpose of Rule 19 is to 'permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources.'" <u>Askew v. Sheriff of Cook Cnty.</u>, 568 F.3d 632, 634 (7th Cir. 2009) (citing <u>Moore v. Ashland Oil, Inc.</u>, 901 F.2d 1445, 1447 (7th Cir. 1990)). "Dismissal, however, is not the preferred outcome under the Rules." <u>Id.</u> (citations omitted). Courts are 'reluctant

18

> to dismiss for failure to join where doing so deprives the plaintiff[s] of [their] choice of federal forum.'" Id. (citations omitted).

Fair Fight Action, Inc. v. Raffensperger, 413 F. Supp. 3d 1251, 1280-82 (N.D. Ga. 2019). At the hearing held on January 31, 2022, the Court expressed its opinion that the relief sought by Plaintiffs to enjoin Georgians First from spending funds in support of Governor Kemp's re-election campaign could be ordered only if Georgians First was a party to this case. In order to expedite the resolution of this matter, Plaintiffs asked for one day to amend their Complaint to add Georgians First as a party defendant, which was accomplished on February 1, 2022. Am. Compl.[5] The presence of Georgians First therefore moots any issue under Rule 19.

---

[5] Plaintiffs had a right to amend their Complaint as a matter of course pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure. Additionally, the Court finds that Georgians First had sufficient notice of the motion for preliminary injunction to allow this Court to enter a preliminary injunction against it under Rule 65(a)(1) of the Federal Rules of Civil Procedure. Georgians First previously filed an Amicus Curiae Brief in Opposition to the Motion for Preliminary Injunction. Brief of Amicus Curiae Georgians First Leadership Committee [Doc. 43-1]. Counsel for Georgians First was present at the January 31, 2022, hearing. Georgians First's filing of both an amicus curiae brief prior to the hearing and supplemental brief after it was named a party defendant indicates that it had "notice and an opportunity to present its opposition to the injunction." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). Additionally, there are no factual matters or credibility determinations at issue in this case that would necessitate Georgians First's appearance at a second hearing. See id., 320 F.3d at 1211 (recognizing that "an evidentiary hearing is not always required before the issuance of a preliminary injunction" where facts are not contested and no credibility determinations need to be made); see also McDonald's Corp. v. Robertson, 147 F.3d 1301, 1308-09 (11th

## IV.   LEGAL STANDARD

In order to obtain a preliminary injunction, a plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that granting the relief would not be adverse to the public interest.  Scott v. Roberts, 612 F.3d 1279, 1290 (11th Cir. 2010); Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005).  A preliminary injunction is an extraordinary remedy which a court should grant only when the movant clearly carries the burden of persuasion as to each of the four prerequisites.  Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).  The decision whether to grant preliminary injunctive relief is within the broad discretion of the district court.  Democratic Party of Ga., Inc. v. Crittenden, 347 F. Supp. 3d 1324, 1339 (N.D. Ga. 2018).

The likelihood of success on the merits is generally considered the most important of the four factors."  Furman v. Cenlar FSB, No. 1:14-CV-3253-AT,

---

Cir. 1998) (concluding that no evidentiary hearing was necessary where the nonmoving party did not deny the moving party's factual allegations and offered no contradictory evidence).

2015 WL 11622463, at *1 (N.D. Ga. Aug. 26, 2015) (citation and quotation

omitted); see also Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)

("Ordinarily the first factor is the most important."). The purpose of a preliminary

injunction is to maintain the status quo until the court can enter a final decision on

the merits of the case. Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).

## V.   DISCUSSION

### A.   There is a Substantial Likelihood of Success on the Merits of Plaintiffs' Claim for Violation of Their First Amendment Rights Under O.C.G.A. § 21-5-34.2 As Applied to the Expenditure of Funds From Georgians First in Support of Governor Kemp's Re-Election.

The First Amendment to the United States Constitution declares that

"Congress shall make no law . . . abridging the freedom of speech." U.S. CONST.

amend. I. "Speech is an essential mechanism of democracy, for it is the means to

hold officials accountable to the people." Citizens United v. Fed. Election

Comm'n, 558 U.S. 310, 339 (2010) (citing Buckley v. Valeo, 424 U.S. 1, 14-15

(1976)) ("In a republic where the people are sovereign, the ability of the citizenry

to make informed choices among candidates for office is essential, for the

identities of those who are elected will inevitably shape the course that we follow

as a nation."). "[T]he First Amendment has its fullest and most urgent application

to speech uttered during a campaign for political office." Eu v. San Francisco

Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989) (internal punctuation and citation omitted).

"Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001); see also Ala. Democratic Conf. v. Broussard, 541 F. App'x 931, 932–33 (11th Cir. 2013) ("It is well-established that political contributions are considered to be political speech, and protected by the First Amendment."). In the context of political speech, the right of association and the right of expression are not analyzed in a vacuum. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 300 (1981) ("A limit on contributions in this setting need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression."). "[T]he right of [political] association is a basic constitutional freedom . . . that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." Buckley, 424 U.S. at 25 (1976) (internal punctuation and citation omitted).

Nevertheless, the right to receive political contributions is not without the ability of a legislative body to impose some restriction.

> The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Our cases have held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption. At the same time, we have made clear that Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others.

McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 191 (2014) (citations omitted). "Compared to restrictions on spending, which receive a higher level of scrutiny, 'restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." Davis, 554 U.S. at 738 (quoting Fed. Election Comm'n v. Beaumont, 539 US. 146, 161 (2003)). Consequently, "[a] law limiting contributions is valid 'if the State demonstrates a sufficiently important interest' and the law is 'closely drawn' to serve that state interest, even if there is a 'significant interference' with political association." Ala. Democratic Conf. v. Att'y Gen. of Ala., 838 F.3d 1057, 1063 (11th Cir. 2016) (quoting Buckley, 424 U.S. at 25). This standard is a "lesser demand" than strict scrutiny. Id. (citing Beaumont, 539 U.S. at 155). "The goal of this 'less rigorous standard of review' is

to give the legislature 'sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process.'" Id. (quoting McConnell v. Fed. Election Comm'n, 540 U.S. 93, 137 (2003), overruled on other grounds by Citizens United, 558 U.S. 310).

State Defendants argue that Plaintiffs' "claims fail because [Plaintiffs have] not properly claimed any constitutional violation" in as much as "the challenged Act does not restrain [Perdue's] speech or his expression at all." Defs.' Opp'n at 12.[6]  State Defendants contend that O.C.G.A. § 21-5-34.2 does not affect Perdue's ability to raise campaign contributions based upon the contribution limits set forth in O.C.G.A. § 21-5-41, a statute which Plaintiffs do not challenge. Id.  State Defendants' argument ignores the actual basis of Plaintiffs' Complaint and Amended Complaint.  Plaintiffs contend that O.C.G.A. § 21-5-34.2 creates an uneven campaign finance scheme in which Governor Kemp, through Georgians

---

[6] Similarly, Georgians First argues that O.C.G.A. § 21-5-34.2 does not impose any limit on Perdue's ability to raise or spend money and attempts to characterize the change imposed by O.C.G.A. § 21-5-34.2 on the campaign finance structure as expanding free speech such that any potential injunction issued by this Court would operate as a "prior restraint" on free speech.  Georgians First's Br. at 8-21. Based on this argument, a legislature would be free to increase contribution limits for any incumbent in a particular election without a concomitant increase solely for any challenger in the name of "expanding speech."  Such an absurd position, of course, is belied by Davis and common sense.

First, can accept unlimited campaign contributions, effectively removing Governor Kemp from the statutory contribution limits imposed by O.C.G.A. § 21-5-41 on Perdue, a candidate running for the same office.  See Compl. ¶¶ 47-57.  Indeed, the Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," and has opined that "the unprecedented step of imposing different contribution and coordinated party  expenditure limits on candidates vying for the same seat is antithetical to the First Amendment."  Davis, 554 U.S. at 738, 743-44.

Based upon Davis, Plaintiffs are correct in their contention that O.C.G.A. § 21-5-34.2 effectively negates the contribution limit upon which all candidates for Governor in the primary election are bound for just one person: Governor Kemp, the incumbent.  The new law leaves Perdue subject to a maximum contribution limit of $7,600 while Governor Kemp can raise unlimited contributions through his leadership committee, Georgians First.  Therefore, whether this law passes constitutional muster depends on whether Defendants can demonstrate a sufficiently important state interest and, if so, whether the law is closely drawn to serve that interest.

**1.     Whether The State Has Demonstrated a Sufficiently Important State Interest**

State Defendants maintain that O.C.G.A. § 21-5-34.2 "serves an important governmental interest in transparency, which is its chief goal." Defs.' Opp'n at 14 (citing statement of State Senator Jeff Mullis, the sponsor of the bill when it was being debated in the Georgia legislature). State Defendants also cite to Ala. Democratic Conf., 838 F.3d at 1065, for the proposition that "transparency plainly is related to and furthers the State's interest in preventing corruption and the appearance of corruption."

State Defendants' contention that transparency is the sufficiently important interest that supports O.C.G.A. § 21-5-34.2 fails for at least three reasons. First, "transparency" is not a recognized state interest that on its own is sufficiently important to justify any campaign finance scheme affecting political contributions. The Supreme Court consistently "has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." McCutcheon, 572 U.S. at 206 (citing Davis, 554 U.S. at 741); see also Citizens United, 558 U.S. at 356 (same); Fed. Election Comm'n. v. Nat'l Conservative Political Action Committee, 470 U.S. 480, 496-97 (1985) (same); Ala. Democratic Conf. v. Strange, No. 5:11-CV-02449-JEO, 2011 WL 13233307, at *10 (N.D. Ala. Dec. 14, 2011) ("While it is clear transparency is a valid state

interest to support a disclosure requirement, <u>Buckley</u>, 424 U.S. at 66-67, this court

is not aware of any cases where the Supreme Court found that transparency, on its

own, was a sufficient enough interest to justify a contribution limit analyzed under

closely drawn scrutiny.").

Second, to the extent State Defendants' quote from <u>Alabama Democratic</u>

<u>Conference v. Attorney General of Alabama</u> purports to equate the state interest in

"transparency" to the interest of "quid pro quo corruption," State Defendants'

quote is misplaced and appears intentionally to have been left incomplete.  The full

quote clearly indicates that the Eleventh Circuit never addressed this issue:

> <u>We need not address the issue of whether transparency is alone a</u>
> <u>sufficient legal justification for a state to regulate campaign</u>
> <u>contributions,</u> because the District Court rightly found that
> "transparency plainly is related to and furthers the State's interest in
> preventing corruption and the appearance of corruption insofar as one
> can only assess whether there has been a quid pro quo exchange if one
> is able to identify the party making the payment."

<u>Ala. Democratic Conf.</u>, 838 F.3d at 1065 (emphasis added).  The specific factual

finding made by the district court in that case was based on a challenge to

Alabama's ban on transfers of funds between political action committees and on

the parties' concession that "transparency is a legitimate and important

governmental concern;" however, the district court's decision was expressly

limited by the following passage which again makes clear that the prevention of

27

corruption is the <u>only</u> sufficiently important interest to justify the restriction of campaign finances:

> However, this does not change the fact that preventing corruption or the appearance thereof is the only interest that the Supreme Court has found sufficiently important. Even if the undersigned were inclined to consider this interest based on the [plaintiff's] concession, the court is nonetheless bound by the Eleventh Circuit's opinion in this case establishing that the only sufficiently important interest is the prevention of corruption.

<u>Ala. Democratic Conf. v. Strange</u>, No. 5:11-CV-02449-JEO, 2015 WL 4626906, at *5, n.11 (N.D. Ala. Aug. 3, 2015), <u>aff'd sub nom.</u>, <u>Ala. Democratic Conf. v. Att'y Gen. of Ala.</u>, 838 F.3d 1057 (11th Cir. 2016).

Third, State Defendants cite to the following statement of State Senator Jeff Mullis, the sponsor of the bill when it was being debated in the Georgia legislature: "Transparency is the word of the decade. The main emphasis of this bill is transparency, and [this bill will] make sure that every expenditure is disclosed, that every dollar that comes into the campaign . . . is disclosed." Defs.' Opp'n at 5 (citing statement of Senator Jeff Mullis). Notwithstanding that there was no mention of preventing corruption by Senator Mullis, the intent of the Georgia General Assembly in passing a law is never gleaned from the statements of individual legislators but by the text of the statute itself. <u>See</u> <u>Malphurs v. State</u>, 336 Ga. App. 867, 871 (2016) ("As we have previously observed, our concern is

with the actual text of statutes, not the subjective statements of individual legislators expressing their personal interest in voting for or against a bill.") (citations omitted); see also SisterSong Women of Color Reprod. Just. Collective v. Kemp, 472 F. Supp. 3d 1297, 1325 (N.D. Ga. 2020) ("[T]he Georgia Code states that '[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy.'") (quoting O.C.G.A. § 1-3-1(a)); GeorgiaCarry.org, Inc. v. City of Atlanta, 602 F. Supp. 2d 1281, 1284 (N.D. Ga. 2008), aff'd, 318 F. App'x 851 (11th Cir. 2009) (internal quotation and citation omitted) (discussing that, to interpret a Georgia statute, courts look first to the plain meaning of the statute, and will only look "outside the four corners of the statute if (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent.").

Despite the fact that State Defendants argue that transparency is the state interest that justifies the campaign contribution scheme permitting unequal restrictions upon candidates running for the same office, there is nothing in the plain language of O.C.G.A. § 21-5-34.2 which indicates that transparency is the state interest. It also is apparent that one of the primary purposes of O.C.G.A. § 21-5-34.2 is to permit the sitting Governor to receive campaign contributions

29

during the legislative session,[7] an action forbidden by state law since 1986.  <u>See</u>

O.C.G.A. § 21-5-35(a), Ga. Laws 1986, p. 957 (eff. Mar. 1, 1987).  O.C.G.A. § 21-

5-35(a), the prior law which still prohibits contributions during a legislative session

for all other statewide elected officials (except a sitting Governor or Lieutenant

Governor who establishes a leadership committee under § 21-5-34.2), was enacted

for the purpose of preventing the appearance of a quid pro quo between the giving

of a contribution and legislative action taken by the recipient of the contribution.

<u>See</u> <u>Teper v. Miller</u>, 82 F.3d 989, 994-95 (11th Cir. 1996) ("[T]he purpose of the

state law is, as the Attorney General and State assert, to prevent the appearance of

impropriety—bribery, to be precise—that may arise when state legislators accept

campaign contributions during the period of time when they are actually

legislating.").  O.C.G.A. § 21-5-34.2, while requiring the disclosure of such

contributions to the sitting Governor who uses a leadership committee to accept

such contributions, does little to reduce the potential corruption that is the focus of

the ban on receiving contributions during the legislative session.

 In sum, the Court finds that the State's claimed important governmental

interest for the enactment of O.C.G.A. § 21-5-34.2, "transparency," standing alone,

---

[7] State Defendants acknowledged this at the January 31, 2022 hearing.

is not a sufficient legal justification for the "unprecedented step of imposing

different contribution . . . limits on candidates vying for the same seat[.]" <u>Davis</u>,

554 U.S. at 743.  Additionally, there is no indication from the plain language of

O.C.G.A. § 21-5-34.2, when considered with the previously enacted prohibition on

contributions during the legislative session, that the state's interest in enacting

O.C.G.A. § 21-5-34.2 is the prevention of corruption or the appearance of

corruption, which is the only recognized state interest sufficiently legitimate to

justify any intrusion upon political contributions.

  **2.**  **Whether the Law is Closely Drawn to Serve the State Interest**

  Even if an important governmental interest was identified that gave

sufficient legal justification for the enactment of O.C.G.A. § 21-5-34.2, *i.e.* the

prevention of quid pro quo corruption,[8] State Defendants have failed to

demonstrate that O.C.G.A. § 21-5-34.2 is closely drawn to serve that interest.

State Defendants argue that

> [t]he Act is closely drawn to serve the government's interest in
> transparency; it did not simply open the floodgates wide to allow all

---

[8] In their Amicus Curiae Brief, Georgians First argues that O.C.G.A. § 21-5-34.2 serves the important governmental interest of the appearance of corruption. <u>Id.</u> at 11.  Of course, it is State Defendants, not Georgians First, that speak for the State in this matter, and State Defendants have identified the important government interest as transparency.  Defs.' Opp'n at 5, 14-15

> incumbents to fundraise year-round. Instead, the Act authorized only a small set of leadership committees. O.C.G.A. § 21-5-34.2(a). By concentrating and incentivizing year-round fundraising in a small number of groups that may be more easily observed, the Act ensures greater transparency in Georgia's elections. And, by limiting the number of committees, which may then disperse funds on behalf of candidates, including Governor Kemp's leadership committee, which may support other candidates for office, the Act facilitates separation between the donor and the ultimate beneficiary of the funds, further decreasing any quid pro quo risk.

Defs.' Opp'n at 15-16. In other words, State Defendants argue that because O.C.G.A. § 21-5-34.2 limits the number of candidates who are no longer subject to the contribution limits in O.C.G.A. § 21-5-41(a), it somehow makes quid pro quo corruption less likely because there are fewer campaigns to monitor. State Defendants' reasoning defies logic. If the governmental interest served by the campaign contribution scheme established by O.C.G.A. § 21-5-41(a) is to prevent quid pro quo corruption, it does not make sense that completely removing a small number of candidates from that regulatory scheme somehow enhances that interest.[9] To the contrary, rather than addressing quid pro quo corruption, O.C.G.A. § 21-5-34.2 removes the regulatory contribution limit safeguards that

---

[9] The effect of O.C.G.A. § 21-5-34.2, as applied to Georgians First, is to permit Governor Kemp to avoid the prohibition on seeking and accepting contributions during a legislative session contained in O.C.G.A. § 21-5-35(a) that applies to all other statewide elected officials and members of the Georgia General Assembly.

were previously established to combat quid pro quo corruption.  If anything,

permitting unlimited campaign contributions in abrogation of the longstanding

regulatory scheme limiting such contributions risks more corruption.

In an effort to justify the impact of O.C.G.A. § 21-5-34.2 to permit Governor

Kemp to seek and accept contributions through Georgians First during the

legislative session, State Defendants argue that O.C.G.A. § 21-5-35(a) "effectively

bars Governor Kemp from significant fundraising leading up to the May 24, 2022

General Primary Election," outside political organizations may continue to raise

and spend unlimited advocacy funds during this time, and the new law "limit[s]

reliance on these outside entities."  Defs.' Opp'n at 3-4.  But there is nothing in

O.C.G.A. § 21-5-34.2 which assures that one penny of funds that would have been

contributed to an "outside political organization" will no longer be so directed.

There is no incentive for a contributor to elect to donate to a sitting Governor's

leadership committee rather than another independent committee which takes

action to support that Governor's re-election.  In fact, for the individual who does

not want his or her contribution to be disclosed as a contribution to the Governor's

leadership committee, it may be a more attractive option not to contribute to the

leadership committee and instead continue to provide donations to an independent

committee supporting the Governor's re-election.  And, more importantly,

permitting Governor Kemp and others who receive contributions through Georgians First during the legislative session does little to foster the prevention of corruption.  If the true purpose underlying the enactment of O.C.G.A. § 21-5-34.2 was to address some perceived inequity in allowing the incumbents' challengers to fundraise during the legislative session while the incumbents are prohibited from doing so, a more closely drawn statute would have prevented everyone, including any candidate, campaign committee, or independent committee, from fundraising during the legislative session.  Instead, O.C.G.A. § 21-5-34.2 permits just two incumbents, through their leadership committees, to avoid the campaign contribution limitations contained in O.C.G.A. § 21-5-41 and the prohibition on accepting contributions during the legislative session contained in O.C.G.A. § 21-5-35(a).

The Court finds that, even if the State's interest in promoting transparency was a sufficiently important government interest to support the enactment of O.C.G.A. § 21-5-34.2, or if the interest actually was to prevent corruption, the statute is not closely drawn to serve those interests.  Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim as

applied to Georgians First's expenditures in support of Governor Kemp's re-election.[10]

## B.    Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) ("[V]iolations of first amendment rights constitute per se irreparable injury'). "The rationale behind these decisions is that chilled free speech . . ., because of its intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted and alterations accepted). Because this Court finds that Plaintiffs are likely to succeed on their First Amendment claim, as applied to Georgians First expenditures in support of Governor Kemp's re-election, Plaintiffs have established irreparable injury.

_____

[10] Given that the Court has found that Plaintiffs are likely to succeed on the merits that O.C.G.A. § 21-5-34.2 is unconstitutional on First Amendment grounds, there is no need to consider whether Plaintiffs would succeed on the merits of their alternative equal protection challenge. See Davis, 554 U.S. at 744 ("Because we conclude that §§ 319(a) and (b) violate the First Amendment, we need not address Davis' claim that they also violate the equal protection component of the Fifth Amendment's Due Process Clause.").

### C.      Balance of Harms

State Defendants assert that they will suffer greater harm than Plaintiffs by the entry of a preliminary injunction because Perdue "would receive a substantial political windfall" by being able to seek and receive contributions during the legislative session. Defs.' Opp'n at 23-24. But the inability of incumbents like Governor Kemp to fundraise during the session has been the status quo since the enactment of O.C.G.A. § 21-5-35(a) in 1986, so any "harm" created by that statute is preexisting and not affected by this Court enjoining O.C.G.A. § 21-5-34.2 as applied to Georgians First. On the other hand, allowing Governor Kemp's re-election campaign to be the beneficiary of unlimited contributions raised through a leadership committee he chairs, while, at the same time, Perdue is restricted to the statutory limit of $7,600 by Georgia law is "antithetical to the First Amendment." Davis, 554 U.S. at 743-44.

At the January 31, 2022, hearing, State Defendants argued that because Perdue has personal wealth and is supported by former President Donald Trump, Governor Kemp suffers greater harm than the average statewide office holder who is unable to raise money during the legislative session. State Defendants reiterate this argument in their supplemental brief by contending that if Georgians First is enjoined from continuing to raise and spend funds to support Governor Kemp's re-

election during the legislative session, Governor Kemp will suffer "serious harm." State Defs.' Suppl. Br. at 12. Since 1986, every incumbent Governor who has run for re-election has been prohibited from seeking or accepting contributions during a legislative session. For Governor Kemp to contend that he is in a unique position because he happens to face an opponent who has the financial resources to self-fund that opponent's campaign is no different from the position asserted by the proponents of the statute struck down in <u>Davis</u> who contended that pre-existing contribution limits should no longer apply in an election where a self-funded candidate spends above a certain amount of money on that candidate's campaign.

The balance of harms therefore weighs in favor of Plaintiffs.[11]

### D.   The Public Interest

State Defendants contend that the public has an interest in transparency in campaign finance, Defs.' Opp'n at 25, but, as previously discussed, upholding the constitutionality of O.C.G.A. § 21-5-34.2 would do little to further that objective.

---

[11] State Defendants raise an alleged additional harm to third persons who have contributed to Georgians First. Defs.' Opp'n at 24. Many of those contributions already have been expended and will not be affected by this Court's order. And Georgians First will continue to be able to expend funds for candidates other than Governor Kemp. Moreover, third persons still will be able to contribute to Governor Kemp's campaign committee, albeit subject to the same $7,600 campaign limit as everyone else, or to an independent committee supporting Governor Kemp's re-election, with no limit on such contributions.

More importantly, the public has no legitimate interest in the enforcement of an

unconstitutional statute. Scott v. Roberts, 612 F.3d 1279, 1297 (11th Cir. 2010).

Therefore, the public interest supports the entry of a preliminary injunction.[12]

## VI.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion

for a Preliminary Injunction [Doc. 2] and Plaintiffs' Amended Motion for a

Preliminary Injunction [Doc. 54] are **GRANTED IN PART and DENIED IN**

**PART**.

Defendant Georgians First Leadership Committee, Inc. is

**PRELIMINARILY ENJOINED** from expending funds beginning on the date of

this Order (1) for the purpose of advocating for the re-election of Governor Kemp

---

[12] And, contrary to the argument raised in their supplemental brief, the "Purcell principle" does not counsel against injunctive relief. Defs.' Suppl. Br. at 13 (citing Purcell v. Gonzalez, 549 U.S. 1 (2006) (per curiam)). The so-called "Purcell" rule is grounded in the idea that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws near, that risk will increase." Purcell, 549 U.S. at 5. The teaching of Purcell is that lower federal courts should not change the rules regarding the conduct of an election on the eve of that election. See, e.g., Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1206-07 (2020) (staying preliminary injunction which affected the absentee ballot process). The injunction entered by this Court has no impact on the casting of votes, the counting of ballots, or anything to do with the election process. Therefore, the Purcell principle does not preclude the injunction in this case.

or the defeat of an opponent of Governor Kemp through the 2022 primary election and 2022 primary runoff election, if any there be, or (2) to defray ordinary and necessary expenses incurred in connection with Governor Kemp's campaign for re-election as Governor of Georgia though the 2022 primary election and 2022 primary runoff election, if any there be, until further Order of this Court.

Nothing in this Order shall prevent Georgians First Leadership Committee, Inc. from continuing to receive contributions and to make expenditures in support of public officials other than Governor Kemp in accordance with the requirements of O.C.G.A. § 21-5-34.2. In addition, nothing in this Order shall operate to make unlawful any expenditures by Georgians First Leadership Committee, Inc. to promote Governor Kemp's re-election or the defeat of an opponent of Governor Kemp previously made prior to the date of this Order or previously committed to be made by a contract entered into prior to the date of this Order even if those expenditures have not yet been completed in accordance with such pre-existing contract.

All other requests for preliminary injunctive relief are **DENIED**.

**IT IS SO ORDERED** this 7th day of February, 2022.

_____
MARK H. COHEN
United States District Judge